**In the United States District Court**

**District of South Carolina**

The Estate of Latoya Nicole Valentine,
by and through Debra Grate, Personal
Representative and Debra Grate, in her
Individual Capacity,
                        Plaintiffs,

        vs.

The State of South Carolina, the South Carolina Department
of Health and Human Services, and the South Carolina
Department of Disabilities and Special Needs, Pickens County
Disabilities and Special Needs Board, Joshua Baker,
Patrick Maley, Christian Soura, Beverly Buscemi, Kathi Lacy,
Thomas Waring, Susan Beck, Elaine Thera and John Owens,
                        Defendants.

        The Plaintiffs, complaining of the Defendants above named, would respectfully show unto

the Court as follows:

**Introduction**

1.      This suit is brought by Plaintiffs Debra Gate in her capacity as Personal Representative for

        the Estate of Latoya Nicole Valentine and Debra Grate in her individual capacity alleging

        violations under the Tort Claims Act and the common law of torts, that the State of South

        Carolina, the Department of Health and Human Services and the Department of Disabilities

        and Special Needs violated the Americans with Disabilities Act (the "ADA") [42 U.S.C. §

        12101 et seq.] and Section 504 of the Rehabilitation Act [29 U.S.C. § 701 et seq.] and their

        rights under the Fourteenth Amendment of the United States Constitution. In addition,

        Plaintiffs allege that officials of the agencies have violated their civil rights that are

        enforceable pursuant to 42 U.S.C. 1983 of the Civil Rights Act and that Plaintiff Grate is

entitled to compensation for her services on grounds of *quantum meriut*.

2.    The Civil Rights claims in this case are brought not only to enforce Plaintiffs' rights, but are brought in their important role as private attorney general. As the United States Supreme Court ruled in *Newman v. Piggie Park Enterprises* and its progeny:

> When the Civil Rights Act of 1964 was passed, it was evident that enforcement would prove difficult and that the Nation  would have to rely in part upon private litigation as a means of securing broad compliance with the law . . . [if a plaintiff obtains relief under the Act] he does so not for himself alone but also as a "private attorney general," vindicating a policy that Congress considered of the highest priority. :, 390 U.S. 400, 401-402 (1968).

## Parties

### Plaintiffs

3.    **Latoya Nicole "Nikki" Valentine** (hereinafter "Valentine"), who died on September 21, 2017, was a citizen and resident of Pickens County.

4.    Valentine had severe intellectual and mental disabilities which prohibited her from managing her own affairs or protecting her rights.

5.    **Debra Grate** is the sister of Latoya Nicole Valentine and she is the duly appointed Personal Representative for the Estate of Latoya Nicole Valentine.

### Agency Defendants

6.    **The State of South Carolina** is a public entity, as defined in 42 USCS § 12131 of the ADA.

7.    **The South Carolina Department of Health and Human Services (DHHS)** is the public entity that is responsible for the administration of Title XIX of the Social Security Act (Medicaid) pursuant to S.C. Code 44-6-30 whose director is appointed by the Governor.

8.    Pursuant to S.C. Code 44-6-40 DHHS, has a statutory duty to prepare and approve state and federal plans prior to submission to the appropriate authority as required by law for final

approval or for state or federal funding, or both.

9.    In preparing such plans, DHHS must be guided by the goal of delivering services to citizens and administering plans in the most effective and efficient ways possible.

10.   That section requires DHHS to continuously review and evaluate programs to determine the extent to which they:

(a) meet fiscal, administrative, and program objectives; and

(b) are being operated cost effectively.

11.   In addition, the General Assembly has directed DHHS to evaluate its plans and programs in terms of their compatibility with state objectives and priorities giving specific attention to areas outlined in Section 44-6-70.

12.   DHHS is obligated to "formulate for consideration and promulgation criteria, standards, and procedures that ensure assigned programs are administered effectively, equitably, and economically and in accordance with statewide policies and priorities.' S.C. Code 44-6-40.

13.   The Director of DHHS must, by statute, inform the Governor and the General Assembly as to the effectiveness of the criteria, standards, and procedures promulgated pursuant to item (5) of 44-6-40.

14.   It is the duty of DHHS to develop in conjunction with other state agencies an information system to provide data on comparative client and fiscal information needed for programs., to develop mechanisms for local planning and to obtain information from participating state agencies necessary to perform duties assigned to DHHS. S.C. Code 44-6-40(7), (8) and (9).

15.    Pursuant to S.C. Code 44-6-70, DHHS must prepare a state plan for each program assigned to it and the department must also prepare resource allocation recommendations based on such plans which must be approved pursuant to state and federal law.

16.    That Section requires DHHS to address state policy and priority areas of service with specific attention to the following objectives:

(a) Prevention measures as addressed in health and human services programs.

(b) Achievement of a balanced health care delivery system assuring that regulations, coverage, and reimbursement policies assure that while the most appropriate care is given, tailored to the client's needs, it is delivered in the most cost-effective manner.

(d) Achievement of optimum cost effectiveness in administration and delivery of services provided quality of care is assured.

(e) Improvement of effectiveness of third party reimbursement efforts.

(f) Assurance of maximum utilization of private and nonprofit providers in administration and service delivery systems, provided quality of care is assured.

17.    **The South Carolina Department of Disabilities and Special Needs (DDSN)** is also a public entity that is responsible for providing care and  treatment to persons who have intellectual and related disabilities pursuant to the  South Carolina Intellectual Disability, Related Disabilities, Head Injuries, and Spinal Cord Injuries Act [42-20-10 et. seq.] and the South Carolina Family Support Act [42-21-10].

18.    Pursuant to S.C. Code 44-20-270, DDSN is the state's designated authority for administering federal fulds Administration of federal funds allocated to South Carolina for intellectual disability programs.

19.    The purpose of DDSN's enabling legislation is to "assist persons with intellectual

4

disability, related disabilities, head injuries, or spinal cord injuries by providing services to enable them to participate as valued members of their communities to the maximum extent practical and to live with their families or in family settings in the community in the least restrictive environment available." S.C. Code 44-20-20.

20. Each of the seven members of the DDSN Commission is appointed by the Governor and can be removed by the Governor.

21. **The Pickens County Disabilities and Special Needs Board (PCDSNB)** is the public entity responsible for the administration, planning and coordination of services for persons with intellectual disabilities and their families that is responsible for the review and evaluation of all county disabilities and special needs services. S.C. Code 44-20-375 and 44-20-385.

22. By statute, PCDSNB has a duty to "represent the best interest of persons with intellectual disability, related disabilities, head injuries, or spinal cord injuries to the public, public officials, and other public or private organizations." S.C. Code 44-20-385(8).

### Individual Defendants

23. Christian Soura served as Director of DHHS from 2014 until 2017 and he is sued in his individual capacity.

24. Joshua Baker is the current Director of DHHS has served as Director of DHHS since 2017 and he is sued in his official and individual capacity.

25. Beverly Buscemi served as Director of DDSN from 2010 to 2017 and she is sued in her individual capacity.

26. Patrick Maley is the current Director of DDSN and he is sued in his official and

individual capacity.

27.    Kathi Lacy served as Associate State Director of DDSN until 2014 and she is sued in her individual capacity.

28.    Susan Beck is the current Associate State Director of DDSN and she is sued in her official and individual capacity.

29.    William Barfield served as Associate State Director of DDSN until 2010 and he is sued in his individual capacity.

30.    Thomas Waring succeeded William Barfield as Associate State Director of DDSN and he is sued in his official and individual capacity.

31.    Elaine Thera is the Director of the Pickens County Disabilities and Special Needs Board (PCDSNB) and she is sued in her official and individual capacity.

32.    John Owens is the Assistant Director at the Pickens County Disabilities and Special Needs Board (PCDSNB) and he is sued in both his official and individual capacity.

33.    Diane Anderson served as the former house manager at Jewel CTH II, where Valentine was placed by DDSN and PCDSNB, and she is sued in her official and individual capacity

**History**

34.    Valentine was born on October 11, 1977, her mental capacity was that of a young child and her IQ and adaptive behavior tests placed her in the profoundly intellectually disabled category.

35.    Valentine's mother died in 1996, leaving her father as the person with authority under the Adult Health Care Consent Act to make decisions regarding her health care.

36.    After the death of her mother, Valentine's sister provided care for Valentine.

37.    Because Defendants failed to provide services necessary for Valentine to remain with her family, she was institutionalized in another county and never provided supports necessary for her to return home.

38.    In 1997, DDSN, PCDSNB and DHHS (then called the "Health Care Finance Administration") acted together to institutionalize Valentine in a more costly Intermediate Care Facility for Persons with Mental Retardation (ICF/MR, now called ICF/ID, or "Intermediate Care Facility for Persons with Intellectual Disabilities), instead of offering to provide the supports Valentine needed to live at home or even in her home county.

39.    Valentine's next of kin was not provided a choice as to where she would be placed and Defendants failed to offer services in the community or services that would allow her to remain in her own home.

40.    DDSN has a long history of failing to protect the health and welfare of its clients, going back to On February 8, 1995, when the Civil Rights Division of the U.S. Department of Justice [DOJ] sent notice to the State of South Carolina that it was conducting an investigation into the conditions of confinement under the Civil Rights of Institutionalized Persons Act ("CRIPA").

41.    The DOJ investigation resulted from reports of daily abuse at the facility operated by DDSN, residents being left unattended and sitting in their own urine and feces for hours.

42.    DOJ reported ten unexplained resident deaths in the facility occurring in just one month.

43.    Around the time that Defendants placed Valentine in the ICF/MR facility, Butkus, Barfield, Lacy and Waring joined together to establish and authorize a "band" funding system that pays the lowest rates for waiver participants who live at home and incentivizes

DSN boards to reduce needed services.

44.   This system has never been formally approved by CMS or determined to be actuarially

sound, and it is not used in any other state in the country.

45.   Repeated investigations of DDSN programs clearly demonstrated DHHS and DDSN were

failing to protect the health and welfare of waiver participants, that DDSN and its

providers were not in compliance with the Medicaid Act or the ADA

46.   In 2005, South Carolina Protection & Advocacy for People with Disabilities issued a

report called "Unequal Justice for South Carolinians with Disabilities: Abuse and Neglect

Investigations" in 2005 which reported systemic abuse, neglect and exploitation of DDSN

clients living in residential programs.

47.    This report that was sent to the Governor, DHHS, DDSN and local DSN boards found

that:

(a) Reporting of abuse, neglect and exploitation in DDSN programs was often delayed, or

in some cases non-existent, and that delays in reporting presented serious problems with

evidence preservation and victim protection.

(b) Little effort was made to refer abuse and neglect in DDSN facilities to law

enforcement and DDSN had failed to address substandard investigative reports.

(c) Investigations were seriously flawed and victims were not protected from further harm.

(d) Cases reported to law enforcement did not receive the necessary investigative effort

and they were rarely prosecuted.

48.   In 2007, a DDSN Commissioner and the internal auditor of DDSN took records to the

Governor's Office documenting diversion of tens of millions of dollars allocated to

provide services to DDSN clients and systemic abuse, neglect and exploitation of DDSN clients.

49.    When the Governor's Office did not take action to address these allegations, the Commissioner and the internal auditor took these records to the South Carolina Legislative Audit Council.

50.    The LAC audit issued in December, 2008, which is incorporated herein by reference, covered the period 2004 through 2007 and it reported that:

(a) DDSN failed to disclose its operations to the public, to provide public access to its directives and denied Commission members access to public information, hindering them from performing their fiduciary duties.

( b) Serious gaps in oversight existed in aspects of consumer health, safety, and well-being, which posed risks to DDSN's consumers.

(c) Despite repeated recommendations by DHHS and CMS, DDSN failed to obtain independent audits of its cost reports, leaving "a significant gap in accountability for millions of dollars."

(d) Other states license residential programs annually, but when Butkus, Barfield and Lacy established the band funding system, these programs were only licensed every three years. LAC found that DDSN failed to provide follow-up reviews and its licensing system was not independent or free of conflicts of interest that impeded objective reviews.

(e) DDSN failed to require national background checks for direct caregivers, as other states required, and was not properly handling threats to consumer safety related to abuse, neglect and exploitation of its clients.

(f) DDSN spent only $7.6 million out of the $25.4 million the General Assembly appropriated for new beds for the intended purpose, thereby losing the 70% federal match on those funds spent for other purposes.

(g)  Out of $10.5 million appropriated for the program to provide services to children with autism over the previous two years, DDSN spent just $671,917 (6%) for services and the LAC "could not determine how DDSN has used the additional funds it received for the autism program."

(h) DDSN informed LAC that funds not spent during a fiscal year did not need to be used for the purpose allocated by the General Assembly and this policy and practice was subsequently confirmed in sworn testimony by Waring and Barfield.

(i) Funds allocated by the General Assembly to DDSN to provide rehabilitation services for persons with head and spinal cord injuries were not used during the year provided and a significant amount of those funds were used for other purposes not authorized by the General Assembly.

(j) DDSN client's funds were often mishandled by disabilities and special needs (DSN) board staff and DDSN did not have sufficient controls to  ensure that consumers' funds are handled appropriately.

(k) Local DSN Boards were making errors in charging for room and board.

(l) DDSN established barriers to competition and consumer choice of providers, with only 3% of residential services being provided by providers other than DSN boards and DDSN provided financial benefits to DSN Boards not provided to other providers.

(m) DDSN provided capital grants to DSN Boards to purchase and maintain residential

10

facilities without authorization from the General Assembly and failed to maintain

contractual controls over DSN board performance, limiting competition and choice by

waiving financial obligations of DSN boards.

(n) Because "DSN boards know they can mismanage their funds with impunity, they have

less incentive to manage prudently and with adequate oversight" and the Boards did not

have incentive to "ensure that their services protect the health, safety, and welfare of their

consumers," resulting in recurring problems due to DDSN's failure to hold DSN boards

accountable.

(o) Although DHHS recommended in 2006 that DDSN's cost reports be independently

audited, DDSN failed to implement those audits.

51.     In May, 2009, the interim director of DDSN announced to the DDSN Commission that

due to a $4.6 million budget reduction, if the agency did not impose caps on home-based

services, thousands of waiver participants would lose services.

52.     DDSN Commissioner Deborah McPherson asked the interim director to use funds held in

DDSN's $7.8 million "debt service account" to avoid cuts to services and an imposition of

caps on home-based services.

53.     The interim director insisted that those funds could only be used for capital improvements,

but soon thereafter, without authorization from the governing board of DDSN or the

General Assembly, more than $3 million from the account was paid to the Budget and

Control Board for purposes not included in the state budget, and $100,000 was set aside

for a contract that was awarded to a former Director of DHHS.

54.     DDSN Commissioners were summoned to Governor Mark Sanford's Office and

instructed by the Governor's chief of staff that budget cuts necessitated that they approve the reductions and caps proposed by DDSN and DHHS.

55.    When McPherson questioned the need for these cost saving measures and requested an extension of time for the DDSN Commission to vote, Governor Sanford's chief of staff called her on her cell phone, pressuring her not to ask CMS for an extension to file the amended waiver application.

56.    The waiver amendment that DHHS submitted to CMS for approval in the fall of 2009, after the Commissioners were told that cuts were necessary due to budget reductions, actually increased the average per capita cost of MR/RD waiver services from $37,000 a year to $51,000 per year, and increased the cost of the program by more than $50 million, while home-based services were dramatically reduced.

57.    DDSN cut reimbursements to providers under the premise of budget reductions, but DDSN did not reduce the amount it billed DHHS for those services and DHHS did not reduce the funding it paid to DDSN based on those cuts.

58.    In 2010, Beverly Buscemi was hired as State Director of DDSN and she retired in December, 2017.

59.    The Office of Inspector General for the United States Department of Health and Human Services conducted an audit of DDSN Medicaid program for the year when home-based services were capped and rates were cut (2010) and Buscemi reported to the DDSN Commission that the OIG auditors were impressed with their findings and would not be issuing a written report.

60.    While claiming to need to reduce services due to a massive budget crisis in FY 2010,

DHHS failed to spend approximately 25% of the state funds it received during FY 2010, more than $225 million in state funds, according to the State Comptroller's report.

61. Because of legislative pressure placed on DDSN after the release of the LAC audit, DDSN entered into a contract with the South Carolina Department of Health and Environmental Control (DHEC to license group homes funded by DDSN, like the one where Valentine was placed.

62. In 2011, DDSN paid DHEC $283,566 to license its group homes, after systemic problems in licensing homes were reported by P&A and LAC.

63. But, when DDSN arbitrarily reduced the the amount paid to DHEC for conducting these licencing services to $223,139, DHEC discontinued licensing DDSN homes.

64. DDSN then entered into a contract with a private corporation to license these homes, paying that corporation more than it paid DHEC in 2011, and the abuse, neglect and exploitation in group homes continued unchecked.

65. In 2010, the former finance director of the South Carolina Department of Social Services, Paul Moore, brother of a state senator, was convicted of a Medicaid fraud scheme involving at least 350 participants in which he embezzled between more than $5.2 million in Medicaid funds between 2004 and 2008.

66. Buscemi informed DDSN Commissioners that DDSN had come through the OIG audit with flying colors, but OIG subsequently released its report which found that DDSN overbilled Medicaid millions of dollars  during FY 2010, requiring DHHS to reimburse the federal government for this overpayment - for a year when services were drastically reduced and the services DHHS billed were not actually provided.

67.     When OIG returned to review the state's compliance with that audit, its auditors found

that DHHS failed to reduce its cost report and that the overbilling to the federal

government for Medicaid waver services continued unchecked.

68.     In 2014, the LAC released its follow up audit reporting that DDSN failed to implement

most of the corrections identified in its 2008 audit.

69.     In 2014, the South Carolina Court of Appeals ruled that the cap on home-based services

violated the Americans with Disabilities Act when applied to persons, like Valentine, who

were at risk of institutionalization, but DDSN continued to apply these caps, preventing

waiver participants in group homes from returning to their own homes.

70.     DDSN and DHHS has continued to impose the waiver caps on home-based services.

71.     In 2014, a former Commissioner reported to Buscemi that DSN Boards were overcharging

waiver participants living in group homes for room and board, but for months no inquiry

was made into these allegations.

72.     After this Commissioner wrote a letter to the Governor reporting serious problems

involving abuse, neglect and exploitation of DDSN clients, at least three DDSN

Commissioners were called into the Governor's Office.

73.     Upon information and belief, this Commissioner also reported these violations to a Deputy

Director of DHHS, but DHHS took no action to correct these violations to protect the

health and welfare of waiver participants.

74.     A DDSN Commissioner reported these violations to the South Carolina Inspector General,

Patrick Maley when the full Commission failed to take action to reimburse the victims.

75.     Maley's reports confirmed that waiver participants across the state were being

14

overcharged for room and board, but he recommended that they only be paid back for two years.

76.    Until April, 2016, PCDSNB charged Valentine $585 a month for room and board, in addition to the $13 a month of food stamps she received to live in a donated house with three other women, sharing a bedroom with another resident.

77.    In April, 2017, PCDSNB increased Valentine's room and board payment to $634 a month, without notice to her next of kin or explanation of the justification for this increase.

78.    In addition, Valentine appears to have been charged up to $106 a month for cable television.

79.    Upon information and belief, Valentine was not credited with the $13 a month food stamp benefit PCDSNB received.

80.    Although Valentine received more than $1,000 a month in Social Security benefits, PCDSNB only allowed her to receive a $10 a week allowance, which, upon information and belief, frequently was not paid to her.

81.    Maley's investigation of Mentor confirmed reports of multiple deaths and elopements in residential programs operated by a former director of DDSN.

82.    Maley's report did not mention that without authorization of the governing board of DDSN, Mentor's contract was increased by millions of dollars during the time covered by the audit or that staff at DDSN had "frozen" and "unfrozen" Mentor from receiving additional residents, thus reducing funds that should have been spent providing home-based services in the least restrictive and most integrative setting.

83.    A third investigation found that untrained non-medical staff were being used in DDSN

group homes to administer medications, in violation of a state law that requires staff administering medications to be trained,

84.     When Valentine lived at home and when she visited her sister's home, she did not demonstrate aggression or noncompliance, but after Valentine was placed in a group home managed by Defendant Anderson as house manager, Valentine was constantly cited for physical aggression and noncompliance.

85.     In 2015, Valentine's sister repeatedly complained about her poor hygiene and records show that her nails were infected with fungus.

86.     In 2015, Valentine was treated for onychomycotic nails, bilateral lesions on the balls of her fees, with aching pain which was "aggravated by walking and standing," ankle equinus deformity and "painful thick toenails that hurt when walking" and a "knot on the top of her right foot," but Defendants repeatedly included walking around a track on Valentine's plan of care.

87.     Valentine was taken to the emergency room in 2016 with bruises on her feet.

88.     Valentine's next of kin was not informed of or invited to Valentine's annual plan meetings, where year after year one of the few goals on her plan of care prepared by Anderson and other employees of the PCDSNB was to walk around a track three times a week.

89.     In 2016, DDSN data reported 1,659 "critical incidents" in its residential programs, up from 1,385 in 2015.

90.     PCDSNB controlled Valentine's monthly $1,091 Social Security benefit, but paid her only a $10 a week "allowance," which appears not to have been paid to her regularly.

91.     PCDSNB also profited from Valentine's poorly compensated labors at the sheltered workshop she attended.

92.     Without the consent of her next of kin, Valentine's personal funds were used to pay for a pre-need funeral at a funeral home not chosen by her family, without the consent of her next of kin.

93.     Valentine's bank records document unexplained debit withdrawals, but she was not capable of using a debit card and DDSN did not obtain consent from her next of kin to open a debit account.

94.     Purchases were made using checks purportedly "signed" by Valentine, without the appointment of a conservator or permission of her next of kin.

95.     Plaintiff Grate's repeated concerns about unexplained injuries, including bruises and scratches were ignored by Defendant Anderson, who reacted hostilely to any complaints.

96.     Plaintiff Grate's repeated  attempts to have Valentine removed from Jewel CTH II in 2016 and 2017 were rebuffed by Defendant Anderson.

97.     In 2016, Valentine lost consciousness, suddenly fell to the floor and was taken to the emergency room, but her next of kin was not notified of this incident or her condition which caused her to lose consciousness when her electrolytes were out of balance.

98.     Anderson repeatedly attempted to alienate Valentine from her sister.

99.     On March 31, 2018, when Valentine asked Defendant Anderson to allow her to call her sister, Anderson made derogatory remarks about her family, told Valentine that her family did not want to see her and threatened to take her dining out privileges away.

100.    Anderson then ordered Valentine into the bathroom to take a shower.

101.    When Valentine refused, Anderson forced her out of the chair by pushing Valentine's head down between her knees and grabbing her by the back of her head.

102.    Anderson then forced Valentine into the shower with the help of another staff member.

103.    When the other staff member stepped out of the room, Anderson slapped Valentine on the face, leaving a hand print on her face, then Anderson left the building.

104.    Valentine told the other staff member that "Diane hit me."

105.    The other staff member reported the abuse to SLED, which referred the case to local law enforcement.

106.    When interviewed, the Assistant Executive Director, John Owens attempted to justify Anderson's action by telling the investigator that PCDSN was "operating 31 positions down causing all staff to work overtime in less than ideal conditions.

107.    Instead of vigorously prosecuting the case, in defense of Defendant Anderson, Defendant Owens reported that "a lot of the staff is stressed."

108.    When Grate learned of this abuse, she removed her sister from the facility, but no one at PCDSNB, DDSN or DHHS informed her of other services available through the waiver program or the availability of family support funds.

109.    DDSN and its officials have systemically diverted funds allocated for family support services to be used for other purposes not authorized by the General Assembly.

110.    PCDSNB informed Grate that Valentine's waiver would be terminated if she did not receive a service within thirty days, attempting to force her back into the group home.

111.    PCDSNB did not inform or educate Grate about Valentine's health condition that caused her to lose consciousness or other conditions requiring ongoing medical care and

treatment.

112.   Grate enrolled Valentine in a day program in Oconee County, but was never informed of the menu of services available through the waiver program for the family support program.

113.   The funding system established by DDSN pays the local DSN Board a capitated rate, giving the boards incentive to deny, reduce or not to inform waiver participants about available services.

114.   Grate was never informed that psychological services and behavior support services were available through the waiver for participants who lived at home.

115.   PCDSNB never informed Grate that nursing services were available under the waiver to monitor her condition at home.

116.   PCDSNB never informed Grate that Valentine could receive personal care attendant services, respite services, adult companion services or other services provided through the waiver.

117.   PCDSNB never told Grate that she could choose a case manager who was not employed by the PCDSNB.

118.   In September, 2017, Valentine went to take a shower and she lost consciousness, as she had done at the group home in 2016, falling in the bathtub and hitting her head.

119.   Valentine was taken by ambulance to the emergency room where she died.

120.   PCDSNB has not provided records which were first requested in January, 2018.

121.   In 2016, without the knowledge of the DDSN Commission or notice to the public, Defendant Thena, Defendant Buscemi and Defendant Waring joined together to commit

to pay more than a quarter of a million dollars to build a dormitory on land owned by a private Christian school in Pickens County - at a time when PCDSNB was "short" 31 direct care positions.

122. DDSN Commissioners did not learn of this project, called the "Jerico Project," until early 2018, around the time of the ceremonial groundbreaking.

123. The 2008 LAC audit criticized DDSN for spending funds allocated by the General Assembly for services to pay for housing, but DDSN has continued to spend those funds for congregate day and residential facilities, then charging residents greater than fair market rent.

124. When questioned about the project, Waring informed DDSN Commissioners that the land upon which the dormitory in Pickens County would be built was owned by the PCDSNB, but that was not true.

125. Waring also informed Commissioners that this project would be partially funded by the South Carolina Housing Trust Fund (HTF), but that also was not true, as no application had been submitted to the HTF.

126. Upon information and belief, the HTF still has not committed funds to this project, as doing so would violate Article XI, § 4 of the Constitution of the State of South Carolina which prohibits direct aid to religious or other private educational institutions prohibited.

127. That Section states:

No money shall be paid from public funds nor shall the credit of the State or any of its political subdivisions be used for the direct benefit of any religious or other private educational institution.

20

128. In 2017, DDSN continued its pattern of transferring millions of dollars allocated by the General Assembly to be spent on "Family Support" to other purposes.

129. S.C. Code 44-20-240 establishes three divisions at DDSN and the statute requires authorization by the governing board of the agency to establish new divisions.

130. In 2017, without notice to or authorization of the DDSN Commission or the General Assembly, Defendant Buscemi spent between $400,000 and $500,000 allocated for services to establish a new division called the "Waiver Administration Division."

131. In 2017, DDSN's administrative costs increased by more than a million dollars over the amount authorized by the DDSN Commission.

132. Defendant Buscemi and Defendant Waring entered into a multi-million dollar contract with Therap without authorization by the DDSN Commissioners to establish a computer system that systemically reduces hours awarded to waiver participants living at home.

133. Defendant Buscemi entered a contract to conduct a pilot project in a single Regional Center to study the potential use of an assessment tool called "SIS" in 2012, but she was directed by the Commission that this tool could not be used for the purpose of allocating resources without coming back to the Commission for review and approval.

134. Defendants Buscemi, Lacy, Waring and Beck joined together to expand the use of a similar assessment instrument to other populations within the DDSN system for the purpose of allocating funds without authorization from the governing board of DDSN.

135. Defendant Buscemi informed the Commissioners when she launched the SIS pilot project in 2012 that this tool should be used because it has been standardized and used with success in other states.

136.    Defendant Buscemi and Defendant Beck then hired twelve new employees in 2016 or 2017 to work in the newly created "Waiver Administration Division" to review plans of care using a nonstandardized similar tool created by unknown employees at DDSN and DHHS which was never approved by the DDSN Commissioners, CMS or the General Assembly and, upon information and belief, has not been used in other states or approved by CMS.

137.    This tool has been used to reduce hours provided to waiver participants living at home who need attendant care and respite care.

138.    Defendant Maley was paid approximately $100,000 as an employee of DDSN to study the band funding system in 2017 when Governor Haley resigned.

139.    The report Maley produced nearly a year later "did not provide recommendations only strengths and weaknesses and direction for improvement" and it did not consider any "more sophisticated actuarial based capitated payment model to providers," nor did Maley's study "identify state (sic) using this model."

140.    Maley obtained input from providers, other states and DDSN employees, identified as "stakeholders" in the report, but failed to consider or obtain input from families or DDSN waiver participants.

141.    Only thirty-seven percent of providers who responded reported that the band payments met the service needs of waiver participants.

142.    Thirty percent reported that the band payments were either grossly or moderately inadequate.

143.    Seventy-one percent of respondents reported that the band payment did not cover the cost

of waiver participants receiving services at home.

144. Plaintiffs' counsel sent a letter to the PCDSN Board requesting records and information pursuant to FOIA on January 22, 2018 to the address listed on the agency's website and the Secretary of State's Office.

145. This letter was returned a month later as being "undeliverable."

146. A second letter requesting records and requesting information pursuant to FOIA was sent to the Director of the PCDSNB on February 26, 2018, but no records have been provided nor has counsel received a response to this second request.

**COUNT ONE**
**Torts**

147. Plaintiffs refer to and reallege each and every fact and allegation in the paragraphs as if fully set forth herein.

148. This count is brought pursuant to the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-210 (2015) and the common law of torts to recover damages for personal injuries Valentine and Grate sustained as a direct and proximate result of the Defendants' wrongful acts, including, but not limited to the failure to properly supervise Valentine in violation of their duty of care and for emotional distress suffered by Valentine and Grate.

149. The State, DHHS, DDSN and the officials named herein had a common law duty of care to provide safe and effective treatment to Valentine and they violated that duty and the duty to provide necessary services for Valentine to live with her family.

150. While in a position of trust, on or about April 21, 2017, Defendant Anderson physically assaulted Valentine, by pushing her, grabbing her hair, shoving her into the bathroom and

slapping Valentine on the face, leaving a mark on her face.

151.    Such physical contact was unlawful, unauthorized, resulted in bodily harm to Valentine and placed Valentine in fear of bodily harm.

152.    Upon information and belief, Valentine was subjected to ongoing abuse, neglect and exploitation by Defendant Anderson and others at Jewel CTH II, which was demonstrated by bruises, scratches, poor hygiene and behavioral problems.

153.    As a direct and proximate result of the wrongful and outrageous actions of Defendant Anderson and other Defendants, Valentine and Grate suffered from severe mental anguish, pain and suffering.

154.    Defendants failed to appraise Grate of Valentine's medical condition and medical treatment which prevented her from obtaining the treatment needed at home.

155.    Valentine also suffered physical injuries, permanent disfigurement,  a decline in her functional capacity and injuries which contributed to her death.

156.    The Defendants, their agents and employees were willful, wanton, reckless, grossly negligent, careless and negligent in the following and other particulars:

(a) Failing to follow rules in supervising patients and in reporting injuries and abuse;

(b) Failing to exercise sufficient control over Valentine to protect her from harm;

( c) Failing to supervise employees who physically and and mentally abused Valentine and failing to promptly report injuries to family members who were her next of kin;

(d) Failing to formulate policies, procedures and regulations to govern staff and personnel to provide a safe environment for clients;

(e) Failing to supervise and to protect Valentine from other patients who physically and

24

mentally abused her;

(f) Failing to use due care in hiring, supervising, training and monitoring and/or conducting reviews of staff and personnel;

(g) Failing to provide services to DDSN clients that are necessary to ensure that they do not harm themselves or others;

(h) Failing to provide adequate care and treatment, notice to family members and to include the next of kin in planning meetings.

(i) Failing to use allocated funds for the benefit of the Valentine and other waiver participants.

(j) Allowing Valentine to be assaulted, mistreated and injured and financially exploited;

(k) Doing or failing to do such other and further things that a reasonably responsible Defendant would have done under the circumstances then and there existing;

(l) Failing to provide the level of supervision DDSN and PCDSNB determined that Valentine needed and failing to spend funds received under Valentine's Social Security number for her care.

157.   Defendants and/or their employees intentionally harmed Valentine when she was on Defendants' premises, Defendants knew or had reason to know of systemic neglect and abuses and failed to control their employees, and the Defendants knew or had reason to know of the necessity and opportunity to exercise such control.

158.   But for the negligence, gross negligence, needlessness, recklessness, willfulness of Defendants and unconstitutional confinement, Valentine's injuries would not have occurred if reasonable care had been used under the circumstances.

159.   As a direct and proximate result of the aforesaid carelessness, needlessness, recklessness,

willfulness, wantonness, negligence and gross negligence of Defendants, their agents, employees and/or servants, Valentine suffered severe and permanent injuries, including without limitation, physical injuries, pain and suffering, emotional distress, mental shock and anguish, wounded feelings, grief and sorrow, trauma, discomfort, anxiety, embarrassment, fatigue, loss of sleep and loss of enjoyment of life.

160.    As a direct and proximate result of the aforesaid carelessness, needlessness, recklessness, willfulness, wantonness, negligence and gross negligence of Defendants, their agents, employees and/or servants, Grate suffered severe and permanent injuries, including without limitation, a decline in her condition, pain and suffering, emotional distress, mental shock and anguish, wounded feelings, grief and sorrow, trauma, discomfort, anxiety, embarrassment, fatigue, loss of sleep and loss of enjoyment of life and companionship with her sister.

161.    The degree of reprehensibility of the defendant's misconduct is high in this case because Defendants allowed funds allocated by the General Assembly to be used for other purposes not approved by the DDSN Commission or made known to the public.

162.    Defendants behavior is also reprehensible because funds that should have been spent providing Grate compensation to care for Valentine at home were used instead by the PCDSNB and DDSN for other purposes, including funding a dormitory on property owned by a private religious school providing a Christian based education, while the Assistant Director of the PCDSNB justified a staff member assaulting Valentine because PCDSNB was thirty-one direct care staff members short.

163.    The Plaintiffs are informed and believe the Estate and Grate are entitled to an award of

damages and punitive damages for these injuries in an amount to be determined by a jury, attorneys fees and costs.

## COUNT TWO
### Americans with Disabilities Act

164. Plaintiffs refer to and reallege each and every fact and allegation in the preceding Paragraphs as if fully set forth herein.

165. Valentine was a disabled person, as defined in the ADA, the state determined that her needs could be met in the community and she did not oppose receiving services in the least restrictive setting, which was in the home of her sister.

166. The services Valentine needed to remain in the family home could have been provided without a fundamental alteration in the state's services.

167. The State, DHHS, DDSN and PCDSN Board violated Plaintiffs' rights under Title II of the ADA, which prohibits disability discrimination by all public entities at the municipal, city, county, and state level and requires compliance with Title II regulations promulgated by the U.S. Department of Justice. 42 U.S.C. §§ 12131–12165.

168. 42 U.S.C. 12131 defines "public entity" to means, first any State or local government, and secondly, any department, agency, special purpose district, or other instrumentality of a State or States or local government.

169. When the Americans with Disabilities Act was signed into law by President George Bush in 1990, it was hailed as "the most ambitious piece of civil rights legislation in the nation's history."

170. The ADA went through numerous drafts, revisions, negotiations, and amendments after

the first version was introduced in 1988 and a national campaign was initiated to write "discrimination diaries" wherein people with disabilities were asked to document daily instances of inaccessibility and discrimination.

171.  A Congressional Task Force on the Rights and Empowerment of People with Disabilities traversed the country holding public hearings which were attended by thousands of people, documenting the injustice of discrimination in the lives of people with disabilities.

172.  Witnesses testified in a joint hearing held in 1988 before the Senate Subcommittee on Disability Policy and the House Subcommittee on Select Education, and it was determined that passage of a comprehensive disability civil rights bill would be a top priority for the next Congress.

173.  When the ADA was introduced in 1989, witnesses came in from all over the country to testify before Congressional committees; written answers were provided to hundreds of questions posed by members of Congress and by businesses and task forces were formed in support of the Act.

174.  Disability rights activists coalesced in front of the Capitol Building, shed their crutches, wheelchairs, powerchairs and other assistive devices, and immediately proceeded to crawl and pull their bodies up all 100 of the Capitol's front steps,

175.  People who were unable to travel come to Washington told their stories in letters, attended town meetings and contacted their representatives in Congress in support of the ADA.

176.  The Congressional committees received boxes loaded with thousands of letters and pieces of testimony that had been gathered in hearings across the country the summer before from people whose lives had been damaged or destroyed by discrimination.

177. The Senate passed the ADA on a vote of 76 to 8 and the Act was considered by an unprecedented four Committees in the House.

178. Each Committee had at least one subcommittee hearing, and more amendments to be explained, lobbied and defeated before the ADA was finally passed in 1990, giving the Department of Justice responsibility for promulgating regulations to enforce the Act.

179. In *Olmstead v. L.C.*, 528 U.S. 581 (1999), the Supreme Court interpreted the Department of Justice's integration mandate of the ADA as prohibiting placement in a congregate setting when the individual chooses to live in a less restrictive setting.

180. The Supreme Court ruled that unjustified institutional isolation of a person with a disability is a form of discrimination because it "...perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life."

181. The Supreme Court added that "Confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment."

182. Pursuant to *Olmstead,* under Title II or the ADA, no person with a disability can be unjustly excluded from participation in or be denied the benefits of services, programs or activities of any public entity.

183.  In 2000, Governor James Hodges issued Executive Order 2000-26 which established a South Carolina Home and Community-Based Services Task Force whose objective was to "develop a comprehensive, effective, working plan as recommended by the United States Supreme Court in its recent decision in *Olmstead v. LC.,* 119 S.Ct. 2176 (1999)."

184. The plan developed by that Task Force has never been implemented and, since that time,

home based services have been systemically reduced or eliminated by DDSN and DHHS, in conjunction with the Governor's Office, despite massive increases in funding.

185. In 2001, President George Bush issued Executive Order No. 1321, reported at 66 Fed. Reg. 33155 which provided "By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to place qualified individuals with disabilities in community settings whenever appropriate, it is hereby ordered as follows:"

186. Section 1. Policy. This order is issued consistent with the following findings and principles:

(a) The United States is committed to community-based alternatives for individuals with disabilities and recognizes that such services advance the best interests of Americans.

(b) The United States seeks to ensure that America's community-based programs effectively foster independence and participation in the community for Americans with disabilities.

(c) Unjustified isolation or segregation of qualified individuals with disabilities through institutionalization is a form of disability-based discrimination prohibited by Title II of the Americans With Disabilities Act of 1990 (ADA), 42 U.S.C. 12101 et seq. [42 USCS §§ 12131 et seq.]. States must avoid disability-based discrimination unless doing so would fundamentally alter the nature of the service, program, or activity provided by the State.

(d) In Olmstead v. L.C., 527 U.S. 581 (1999) (the "Olmstead decision"), the Supreme Court construed Title II of the ADA [42 USCS §§ 12131 et seq.] to require States to place qualified individuals with mental disabilities in community settings, rather than in

institutions, whenever treatment professionals determine that such placement is appropriate, the affected persons do not oppose such placement, and the State can reasonably accommodate the placement, taking into account the resources available to the State and the needs of others with disabilities.

(e) The Federal Government must assist States and localities to implement swiftly the Olmstead decision, so as to help ensure that all Americans have the opportunity to live close to their families and friends, to live more independently, to engage in productive employment, and to participate in community life.

Sec. 2. Swift implementation of the Olmstead decision: agency responsibilities. (a) The Attorney General, the Secretaries of Health and Human Services, Education, Labor, and Housing and Urban Development, and the Commissioner of the Social Security Administration shall work cooperatively to ensure that the Olmstead decision is implemented in a timely manner. Specifically, the designated agencies should work with States to help them assess their compliance with the Olmstead decision and the ADA [42 USCS §§ 12101 et seq.] in providing services to qualified individuals with disabilities in community-based settings, as long as such services are appropriate to the needs of those individuals. These agencies should provide technical guidance and work cooperatively with States to achieve the goals of Title II of the ADA [42 USCS §§ 12131 et seq.], particularly where States have chosen to develop comprehensive, effectively working plans to provide services to qualified individuals with disabilities in the most integrated settings. These agencies should also ensure that existing Federal resources are used in the most effective manner to support the goals of the ADA [42 USCS §§ 12101 et seq.]. The

31

Secretary of Health and Human Services shall take the lead in coordinating these efforts.

(b) The Attorney General, the Secretaries of Health and Human Services, Education,

Labor, and Housing and Urban Development, and the Commissioner of the Social

Security Administration shall evaluate the policies, programs, statutes, and regulations of

their respective agencies to determine whether any should be revised or modified to

improve the availability of community-based services for qualified individuals with

disabilities. The review shall focus on identifying affected populations, improving the

flow of information about supports in the community, and removing barriers that impede

opportunities for community placement. The review should ensure the involvement of

consumers, advocacy organizations, providers, and relevant agency representatives. Each

agency head should report to the President, through the Secretary of Health and Human

Services, with the results of their evaluation within 120 days.

(c) The Attorney General and the Secretary of Health and Human Services shall fully

enforce Title II of the ADA [42 USCS §§ 12131 et seq.], including investigating and

resolving complaints filed on behalf of individuals who allege that they have been the

victims of unjustified institutionalization. Whenever possible, the Department of Justice

and the Department of Health and Human Services should work cooperatively with States

to resolve these complaints, and should use alternative dispute resolution to bring these

complaints to a quick and constructive resolution.

(d) The agency actions directed by this order shall be done consistent with this

Administration's budget.

187.    Three years after the ADA was passed, the South Carolina General Assembly passed the

South Carolina Family Support Act to bring the State into compliance with the ADA. S.C. Code of Laws 44-21-10.

188.    That state Act provides that "It is the intent of the General Assembly that individuals with intellectual disability or related disabilities or head injuries, spinal cord injuries, or similar disabilities and their families be afforded supports that emphasize community living and enable them to enjoy typical lifestyles." S.C. Code of Laws 44-21-10(A).

189.    In the Family Support Act, the General Assembly recognized that "families are the greatest resource available to individuals with intellectual disability or related disabilities or head injuries, spinal cord injuries, or similar disabilities and that families must be supported in their role as primary caregivers." S.C. Code of Laws 44-31-10(A).

190.    The Act promotes supporting individuals and families in their effort to care for themselves or their family members at home, because home-based care "is more efficient, cost-effective, and sensitive than maintaining people with intellectual disability or related disabilities in out-of-home residential settings." S.C. Code of Laws 44-31-10(A).

191.    The General Assembly's intent in passing the Family Support Act was to " assist individuals with disabilities and their families who desire or choose to support a family member with intellectual disability or a related disability or head injury, spinal cord injury, or similar disability in their home." S.C. Code of Laws 44-31-10(A).

192.    In recognition of the importance of families, the General Assembly directed DDSN to administer its services using the following guidelines:

(1) Families and individuals with intellectual disability...are best able to determine their own needs and should be able to make decisions concerning necessary, desirable, and

appropriate services.

(2) Individuals and families should receive the support necessary to care for themselves or their family member at home.

(3) Family support is needed throughout the lifespan of an individual with intellectual disability.

(4) Family support services should be sensitive to the unique needs, strengths, and values of the individuals and the family and should be responsive to the needs of the entire family.

(5) Family support should build on existing social networks and natural sources of support and should encourage community integration.

(6) Family support services should be provided in a manner that develop comprehensive, responsive, and flexible support to individuals and families as their needs evolve over time.

(7) Family, individual, and community-based services must be based on the principles of sharing ordinary places, developing meaningful relationships, learning things that are useful, making choices, as well as promoting an individual's self-esteem.

(9) Family support services should be sufficient to enable families to keep their family members with intellectual disability... at home or be sufficient to enable the individual with a disability to remain at home.

193.    Pursuant to S.C. Code 44-21-50, the General Assembly directed local DSN Boards to

assist each individual or family for whom services will be provided in assessing its needs and shall prepare a written plan with the person and family. <u>The needs and preferences of the individual and family will be the basis for determining what goods and services will be provided within the resources available</u>."

194. When Defendants imposed a cap on home-based services, the cost of the ID/RD waiver program increased drastically and it would not have caused a fundamental alteration in the State's program to have provided waiver participants living in group homes the option of receiving non-capped waiver services at home.

195. Defendants failed to provide Valentine and Grate the Family Support Services described in S.C. Code 44-21-60, including, but not limited to family support services coordination, information, referral, advocacy, educational materials, emergency and outreach services, and other individual and family-centered assistance services such as:

(1) respite care;

(2) personal assistance services;

(4) homemaker services;

(5) minor home and work site modifications and vehicular modifications;

(6) specialized equipment and maintenance and repair;

(7) specialized nutrition and clothing and supplies;

(8) transportation services;

(9) health-related costs not otherwise covered;

(10) licensed nursing and nurses' aid services;

(11) family counseling, training, and support groups;

(12) financial assistance;

(13) emergency services;

(14) recreation and leisure needs.

196. Instead of operating its programs in compliance with the ADA and the state Family

Support Act passed to bring South Carolina into compliance with the ADA, DDSN and

DHHS have administered the home and community based waiver programs operated by

DDSN giving the very lowest "band funding" to persons who live at home with their

families and by failing to provide supports needed by families to keep their loved ones at

home.

197. When Grate complained about the quality of care provided to her sister, Defendant

Anderson and PCDSNB retaliated against Grate and Valentine in violation of the anti-

retaliation provision of the ADA.

198. By its policies, diversion of funds, and operation programs Defendants have abridged the

rights of Valentine and Grate, which deprived Valentine of them of their Fourteenth

Amendment right to life and liberty, without due process of law.

199. Defendants violated Valentine's right to equal protection by repeatedly subjecting

Valentine to physical abuse and neglect in programs operated by DHHS, DDSN and

PCDSNB and by failing to provide her with the same law enforcement protections that

persons who do not have disabilities enjoy.

200. The primary obligation to provide services to qualifying persons under the ADA is that of

the states and the Governor is responsible for assuring that services are provided in

compliance with the integration mandate of the ADA, whether or not the state chooses to

provide these services through a Medicaid program.

201. Instead of developing and instituting a valid Olmstead plan, South Carolina and the agencies that administer the Medicaid waiver programs have systemically reduced access to home based services, while diverting funds allocated by the General Assembly and keeping the beds of its local DSN Boards full.

202. By failing to inform Grate of the availability of home based services, she was not fairly compensated for services needed to keep Valentine from returning to a dangerous group home at greater cost to taxpayers.

203. Plaintiffs are entitled to an award of damages, punitive damages, attorney fees and costs.

## COUNT THREE
## Section 504 of the Rehabilitation Act

204. Plaintiffs refer to and reallege each and every fact and allegation in the preceding Paragraphs as if fully set forth herein.

205. Section 504 of the Rehabilitation Act provides that no otherwise qualified individual with a disability shall, solely by reason of her or his disability, be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance, pursuant to 29 U.S.C.S. § 794(a).

206. Valentine had a qualifying disability and was otherwise qualified to receive the benefits of public services, programs, and activities provided by the State, DDSN and DHHS and she was excluded from participation in or denied the benefits of the State's services, programs, and activites and otherwise discriminated against, on the basis of her disability.

207.   Defendants' actions which violated the Rehabilitation Act were intentional and they acted with conscious disregard for the rights of Valentine and Grate as described above and in Count Four.

208.   Defendants knew or should have known that their actions violated Plaintiffs federally protected rights and they were on notice of Plaintiffs needs for accommodations and home-based services.

209.   Defendants actions were more than negligent, they involved an element of deliberateness and a pattern of wrongdoing described herein.

210.   The remedies for violations of Section 504 of the Rehabilitation Act are coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964.

211.   Plaintiffs are entitled to damages, punitive damages and an award of attorney fees.

## COUNT FOUR
### Violation of 42 U.S.C. 1983

212.   Plaintiffs refer to and reallege each and every fact and allegation in the preceding Paragraphs as if fully set forth herein.

213.   Plaintiffs bring this action not only for themselves, but in their capacity as private attorney general to enforce the civil rights of others.

214.   The right to live with one's family free of government interference and control is one of the most sacred rights Americans hold and this right derives from the Fourteenth Amendment of the Constitution of the United States, the Constitution of the State of South

Carolina, state statutes creating DDSN at 44-20-210 and the Family Support Act at 44-21-10 et. seq.

215.  By failing to provide services necessary for Valentine to live with her family, DDSN and DHHS violated her right to liberty, to be free from abuse and neglect, to safe and appropriate treatment and to equal protection and the right of Grate to receive compensation for care provided to Valentine.

216.  Defendants joined together to violate the rights of Valentine and Grate that are guaranteed by the Fourteenth Amendment of the United States Constitution, the Constitution of the State of South Carolina and the Medicaid Act and the state and local agency actors are sued either in their official capacity, individual capacity, or both, as set forth above.

217.  The State and its agents have knowingly failed to protect the rights of persons receiving services from DDSN, thereby placing Valentine and other waiver participants at tremendous risk of harm and causing them to suffer abuse, neglect and exploitation, violating their right to live free from fear and harm in the least restrictive setting with their families.

218.  All of the individual defendants were personally aware of the deaths and injuries to DDSN waiver participants and the systemic abuse, neglect and exploitation of participants in those programs and the failure to provide services families need to prevent institutionalization of consumers and citizens' loved ones.

219.  All of the Defendants were aware and informed that families were being forced to place their loved ones in unsafe facilities, disrupting the family unit.

220.    These DHHS Directors and former Directors and the Governors have failed to require changes and compliance with applicable laws to protect the health and welfare of participants, instead, ordering study after study, whose recommendations were not followed, simply to give the appearance to legislators, CMS and other regulators that affirmative actions were being taken, when they were not.

221.    Defendants repeatedly and systemically failed to comply with federal regulations and industry standards that required them to protect the health and welfare of Valentine and they have failed to establish reasonable standards, as required by the Medicaid Act in providing care to Valentine and other waiver participants.

222.    Defendants violated their duty to inform Grate and Valentine of all feasible alternatives under the home and community based waiver and failed to inform and offer to Grate compensation for providing care for her adult sister.

223.    Defendants have illegally spent funds allocated for services to pay for a congregate dormitory on the grounds of a private religious school, thereby leaving the PCDSNB thirty-one staff short when Valentine was physically assaulted and battered by Defendant Anderson.

224.    Defendants have violated the equal protection rights of Valentine and other waiver participants by failing to aggressively prosecute offenders who abuse, neglect or exploit waiver participants.

225.    Instead, Defendant Owens justified Anderson's assault on a vulnerable adult as resulting from the inadequate staffing at PCDSNB.

226.    As a condition of receiving federal matching funding, DHHS must assure CMS that it will protect the health and welfare of waiver participants, and the Directors of DHHS failed to comply with this mandate, thereby causing Plaintiffs injury.

227.    Plaintiff Valentine was subjected to ongoing acts of abuse, neglect and exploitation while living in residential facilities operated by or funded by DDSN and DHHS and Defendants violated their common law and statutory duty of care to provide safe and reasonable treatment.

228.    When Plaintiff Grate complained about the poor quality of care provided by the PCDSNB, staff retaliated by attempting to intimidate her by inquiring about Valentine's sleeping arrangements on her visits home, causing Grate tremendous stress and emotional distress, because it was obvious to Grate that if she attempted to remove her sister, Defendant Anderson would allege that Valentine was being abused at home.

229.    Valentine suffered repeated repeated injuries at Jewel CTH II, including, but not limited to bruises, scratches, withholding communications with her family, being burned with a cigarette and being slapped by the house manager.

230.    Valentine and Grate are entitled to actual and punitive damages, and an award of legal fees and costs.

**COUNT FIVE**

**Quantum Meruit**

231.    Plaintiffs refer to and reallege each and every fact and allegation in the preceding Paragraphs as if fully set forth herein.

232.    *Quantum meruit* is an equitable doctrine which allows recovery for unjust enrichment under a quasi-contract theory.

233.    The elements of a *quantum meruit* claim are: (1) a benefit conferred upon the defendant by the plaintiff; (2) realization of that benefit by the defendant; and (3) retention by the defendant of the benefit under conditions that make it unjust for him to retain it without paying its value.

234.    As described above, Defendant was conferred benefits through the services provided by Grate when Valentine was abused and removed from Jewel CTH II to protect her from further harm, and Defendants failed to inform Grate of home-based services available through the waiver program, including paying a family member to provide attendant care services.

235.    Defendant realized that benefit and it would be unjust for Defendant to retain that benefit without paying its value.

236.    Plantiff Grate is entitled to compensation for her services at the rate paid by DHHS to DDSN for personal care attendant services, legal fees and costs.

PRAYER FOR RELIEF

237.    Plaintiffs pray that this Court will award the relief requested herein and order Defendants to pay damages, punitive damages and legal fees and costs.

238.    Plaintiffs request that the Court consider that this lawsuit is brought in Plaintiffs capacity as a private attorney general and that the Court will order Defendants to provide relief to

other waiver participants as necessary to require Defendants to come into compliance with the federal and state laws cited above.

239.   Plaintiffs pray that this Court will order such other relief as shall be just under the circumstances.

Respectfully submitted,


s/ Patricia Logan Harrison

Patricia Logan Harrison

57 Rosemond Road

Cleveland, South Carolina

803 360 5555

Fed. I.D. 6963

pharrison@loganharrisonlaw.com


March 31. 2018