IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| The Estate of Latoya Nicole Valentine, by and through Debra Grate, Personal Representative and Debra Grate, in her individual capacity, | C/A No. 3:18-00895-JFA |
| Plaintiffs, | |
| vs. | |
| The State of South Carolina; the Office of the Governor; Henry D. McMaster; Nimrata "Nikki" Haley; Joshua Baker; Christian Soura; the South Carolina Department of Health and Human Services; the South Carolina Department of Disabilities and Special Needs; the Pickens County Disabilities and Special Needs Board; Mary Poole; Patrick Maley; Lois Park Mole; Susan Beck; Beverly Buscemi; Stanley Butkus; Kathi Lacy; William Barfield; Thomas Waring; Robert Kerr; William Danielson; Elaine Thena; John Owens; and Diane Anderson, | **AMENDED MEMORANDUM OPINION & ORDER** |
| Defendants. | |

This matter is currently before the Court on eight separate motions for summary judgment. Specifically, Plaintiff has moved for partial summary judgment (ECF No. 225) and all remaining defendants in this action have asserted various motions for summary judgment that combine to request the dismissal of the entirety of Plaintiff's Second Amended Complaint ("SAC"). The defendants' motions are grouped as follows: Diane

Anderson (ECF No. 198); The Office of the Governor (ECF No. 201); Nimrata "Nikki" Haley and Henry McMaster (ECF No. 202); South Carolina Department of Disabilities and Special Needs ("SCDDSN" or "DDSN")(ECF No. 203); William Barfield, Susan Beck, Beverly Buscemi, Stanley Butkus, William Danielson, Robert Kerr, Kathi Lacy, Patrick Maley, Lois Park Mole, and Thomas Waring (ECF No. 204); Joshua Baker, Christian Soura, and the South Carolina Department of Health and Human Services ("SCDHHS" or "DHHS")(ECF No. 205); and John Owens, Elaine Thena, and the Pickens County Disabilities and Special Needs Board ("PCDSNB")(ECF No. 206). Having been fully briefed, these motions are now ripe for review.

## I.     FACTUAL HISTORY

The following facts are construed in the light most favorable to the non-moving party. Any dispute as to a specific factual issue is noted below to the extent it is applicable to both the Plaintiff's motion and a defendant's cross-motion.

This suit is brought by Plaintiff Debra Grate ("Grate"), in her capacity as Personal Representative for the Estate of Latoya Nicole Valentine ("Valentine"), who died on September 21, 2017; and by Debra Grate, in her individual capacity as the sister and caregiver of Valentine and as a taxpayer. Grate is Valentine's biological half-sister.

Valentine, having an IQ of 36, was an intellectually and mentally disabled adult who qualified for and received Medicaid benefits. Valentine had these disabilities since birth and has been described as having the mental equivalency of a toddler. Sometime in the early 1990's, Valentine's father, William Valentine ("William"), left Valentine and her mother causing their home to be repossessed. Sometime in 1992, Valentine and her mother

moved into Grate's home. Valentine's mother died in 1995. Grate's third child was born in 1996 and she sought full-time employment to support her family. Unable to provide services for both her family and Valentine, Grate returned Valentine to her father, William. Shortly thereafter, however, William delivered Valentine to her aunt, Margaret Cunningham. Cunningham then turned Valentine over to the care and custody of SCDDSN on January 29, 1997.

Valentine was initially placed in an ICF/ID (Intermediate Care Facility) from February 25, 1997 through April 2004. Valentine was placed in a CTH (Community Training Home) in 2004 and ultimately transferred to Jewell Home CTH II[1] (Jewell Home), which is operated by PCDSNB, in February 2005. Here, Valentine received daily living assistance with toileting, bathing and dressing, as well as eating and medications. It is here at Jewell Home that Plaintiff's allegations of abuse mentioned in the SAC begin. While at Jewell Home, Grate was allowed to visit Valentine and took Valentine home with her overnight on several occasions.

Plaintiff alleges that Valentine suffered multiple episodes of abuse spanning several years while at Jewell Home. Specifically, Plaintiff alleges Valentine was: burned on her chest with a cigarette in April 2016;[2] forced to walk around a track with bruised/injured feet in 2015–2016; subjected to human bites; subjected to medication errors; chemically

---

[1] These facilities provide direct care staff 24 hours a day, 7 days a week. Jewell Home is located in a residential 3-bedroom, 2-bathroom home in Pickens county. Residents of Jewell Home are often referred to as "consumers."

[2] Defendants dispute that the mark on Valentine's chest was a cigarette burn and medical records label it as an "excoriation."

3

restrained; and assaulted directly by Jewell House Manager Diane Anderson[3] on March 31, 2017.

Plaintiff alleges that the March 31, 2017 assault included Anderson twisting Valentine's arm behind her back and dragging Valentine by her hair into a Jewell Home bathroom after she refused to shower. Once in the bathroom, Plaintiff alleges that Anderson slapped Valentine in the face and then left another Jewell Home employee to bathe her. That employee, Courtney Reynolds, later contacted the South Carolina Law Enforcement Division ("SLED") to report this incident and also informed her supervisors.

Anderson was then placed on administrative leave without pay pending the investigation of this incident. Anderson was later criminally charged. These charges were ultimately expunged after Anderson completed a pre-trial intervention program. PCDSNB later terminated Anderson with no back pay. Although Plaintiff contends Anderson's employment was later reinstated with back pay, this contention is based solely on an erroneous report attached to DDSN's motion for summary judgment. DDSN has since filed an amended report showing the true disposition and Anderson herself testified that she was fired with no backpay. Accordingly, there is no genuine issue of material fact as to Anderson's termination.[4] (ECF No. 222-4, p. 6).

---

[3] Anderson became House Manager at Jewell Home beginning in October 2008.

[4] Even if a genuine issue of fact were to exist, this fact is not material as the decision to terminate or reinstate Anderson came several months after Valentine's death and thus could not have given rise to any of Plaintiff's claims.

Anderson maintained in her deposition that she never assaulted Valentine. Thus, a genuine issue of material fact exists as to whether the slapping and hair pulling took place on March 31, 2017. Anderson also denies ever burning Valentine with a cigarette. Plaintiff, however, asserts Anderson was the only individual at Jewell Home that smoked, and she is therefore the individual who burned Valentine on her chest.

After the incident wherein Anderson allegedly slapped Valentine, Grate was informed of the alleged assault and expressed her desire to take Valentine back into her home permanently. Grate communicated this request to PCDSNB on April 12, 2017 and Valentine was released to Grate on April 13, 2017. Several months later, while in Grate's home, Valentine fell in the shower and was taken to the hospital via ambulance. She died shortly thereafter on September 21, 2017.

The manner of death listed on the death certificate is "natural." The coroner's report states that a "traumatic event did not contribute to this death" and Valentine's treating physician noted that "the left ventricle of her heart was enlarged; [the physician] could see a clot in the ventricle suggesting this was a chronic issue." (ECF No. 198-4, p. 2). No autopsy was performed. However, within the SAC, Plaintiff contends Valentine actually lost consciousness while in the shower due to hyponatremia (a medical condition causing low sodium levels) and fell hitting her head on a toilet. Plaintiff avers this head trauma caused her death. Valentine suffered from hyponatremia while at Jewell Home, but Grate alleges she was never informed of this condition prior to taking Valentine into her home.

Although Plaintiff has asserted this hyponatremia theory as Valentine's cause of death, she has presented no evidence to support such a theory. Plaintiff has identified no

expert or medical records to support this theory. Defendants on the other hand, have identified Valentine's treating physician and the coroner who authored the death certificate to show that Valentine's actual cause of death was "cardiac arrhythmia with sudden death probable coronary thrombus." (ECF No. 198-4, p. 3). Additionally, the emergency room and EMS records do not show any type of head injury, let alone one contributing to her death.

Grate testified in her deposition that she had no evidence of the cause of Valentine's death prior to filing this lawsuit and later receiving the coroner's report shown to her by her attorney. Given the absolute absence of evidence to support Plaintiff's contention that Valentine's death was caused by a low sodium condition and head trauma, the Court finds that there is no genuine issue as to the cause of Valentine's death. Further, the Court finds for purposes of these motions—and all remaining stages of this litigation—that Valentine's death was caused by "cardiac arrhythmia with sudden death probable coronary thrombus," —the condition stated on her death certificate. *See* Fed. R. Civ. P. 56(g) ("If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case.").

During Valentine's residency at Jewell Home, it appears that all parties in this litigation deemed Valentine's aunt Cunningham as the proper guardian[5] entrusted with placing Valentine in DDSN custody and thereafter consenting to her medical treatment and

---

[5] DDSN records indicate that Cunningham believed herself to be Valentine's legal guardian but was unable to locate paperwork to verify this belief. (ECF No. 205-8, p. 10–11).

continuing care. DDSN records state that "Margaret Cunningham (Aunt) is actually [Valentine's] guardian." (ECF No. 205-8, p. 12). Cunningham routinely signed forms such as the Consumer Statement of Rights,[6] Consumer Financial Plans, Financial Authorizations, the Acknowledgement of Consumer Rights, the Medical Care Agreement, the Authorization to Release Medical Records, the Consent for Photos and Videos, the Consent for Visitation form which described who could visit Valentine, and the Disposition of Client Clothing form. (ECF No. 198-2). Cunningham, along with Valentine, also executed Valentine's freedom of choice forms in which she certified she was informed "of the feasible alternatives" and "given the opportunity to choose between institutional and home and community-based services." (ECF No. 239-1, p. 10).

Cunningham was the individual informed of any incidents or emergency medical treatment Valentine received. Additionally, prior to taking custody of Valentine in 2017, Grate expressly sought prior approval from William and Cunningham. They both approved and William executed the proper forms allowing Valentine to leave PCDSNB and live with Grate. Despite this however, Grate now avers that she was the proper individual to make decisions on behalf of Valentine pursuant to the Adult Health Care Consent Act. S.C. Code Ann. § 44-66-30(A). Accordingly, Grate avers that she should have been informed of Valentine's health conditions and informed of any reasonable alternatives of care available

---

[6] These rights include the "right to live and receive services in the least restrictive place that is available;" "the right to ask for a discharge;" and the "right to make decisions about your health care unless another person has been authorized to help you make those decisions." (ECF No. 198-2, p. 2).

to her. There is no indication that Grate made any such requests or assertions during Valentine's lifetime.

Grate also avers that she was retaliated against after reporting her belief that Valentine had been burned with a cigarette while at Jewell Home. This retaliation included Anderson or other PCDSNB staff falsely asserting that Valentine reported sleeping with Grate's husband on home visits and initiating an investigation into the same.

Plaintiff's SAC contains various other claims of financial exploitation including allegations that certain defendants used Valentine's funds to purchase a pre-need funeral contract, several boxes of paper, and to make co-pays for dental services that should have been covered by Medicaid. Plaintiff also avers Valentine was regularly charged for Coppertone sunscreen even though she rarely was in the sun. Additionally, Plaintiff asserts that Valentine was overcharged for room and board and cable television at Jewell Home.

Apart from these allegations relating specifically to Valentine herself, Plaintiff also sets forth various vague and wide-ranging allegations of constitutional violations stemming from the allocation of funds and the budgeting system used to fund Medicaid services throughout South Carolina. Such allegations include that DDSN failed to provide cost reports to the federal government for its Medicaid programs costing in excess of $550 million a year. Plaintiff also avers that various defendants conspired to improperly divert at least $350,000 to build a dormitory on the campus of a religious school (the "Jericho Project"). Plaintiff additionally argues that the implementation of unconstitutional service caps has harmed "persons like Valentine." (ECF No. 42, ¶ 41).

Despite these accusations, Plaintiff has failed to allege, let alone offer evidence to support, a causal connection between any funding issues and injuries sustained personally by herself or Valentine. The record contains no indication that Valentine's services or level of care were ever reduced or limited pursuant to caps or lack of funding. There is no evidence to show Valentine was ever denied any service or treatment due to lack of funding. Indeed, all of Valentine's living and medical needs were provided for by Medicaid funds. Additionally, there is no indication that Jewell Home was ever understaffed or underfunded. Thus, Plaintiff has failed to show any sort of causal connection between the alleged mishandling of funds allocated by the South Carolina General Assembly and damages alleged by Grate or Valentine.

The Court would note that it has previously addressed the lack of causation with Plaintiff during this litigation. (ECF No. 153, p. 14) ("This concern is intensified by Plaintiffs' continued failure to allege a causal connection between their individual specific injuries and the actions of the various high-ranking government officials and agencies named in this action."); (ECF No. 166, p. 4) ("Plaintiffs continuously reassert that agencies 'used funds allocated for services not authorized by the Medicaid program' but fail to show how, or whether, that alleged misuse of funds ever affected Valentine or Grate. The court referenced this failure to allege a causal connection in the Order and Plaintiffs' argument here is simply a rehashing of their original position."); (ECF No. 196, p. 14) ("[T]his Court, as it has expressly stated several times in this litigation, continues to have concerns regarding the casual connection between Plaintiffs' alleged damages and the tenuous allegations against the Governors.").

Despite these repeated warnings, Plaintiff continues to rely solely on vague allegations of nefarious dealings at large and fails to offer any specific evidence substantiating these claims or connecting them in any way to Valentine or Grate. As shown below, this failure to put forth specific evidence is fatal to a majority of Plaintiff's claims.

## II.     PROCEDURAL HISTORY

Out of these above allegations, Plaintiff's SAC asserts four causes of action against twenty-three defendants.[7] The four causes of action include: (1) violation of the ADA and § 504 of the Rehabilitation Act; (2) violation of 42 U.S.C. § 1983; (3) violation of 42 U.S.C. § 1985; and (4) RICO violations.

After initiating this lawsuit and proceeding through multiple amended complaints and several motions to dismiss, this Court also decided numerous discovery matters. (ECF No. 196) (summarizing the discovery disputes). Of note, this Court held that despite naming 23 separate defendants, Plaintiff's counsel served written interrogatories and requests for production on only one party, PCDSNB. However, those written discovery requests were served not in the instant federal litigation, but in a parallel state court action.[8] Of these 23 defendants, Plaintiff's counsel deposed only one, William Barfield, within this federal action. Defendant Diane Anderson was deposed within the parallel state court

---

[7] Defendants the State of South Carolina and Mary Poole were previously dismissed from this action by order dated September 23, 2019. (ECF No. 104).

[8] Plaintiff asserted state law tort claims arising out of the same set of facts discussed above against the same defendants in state court shortly after initiating this lawsuit. *See Estate of Latoya Nicole Valentine, by and through Debra Grate, Personal Representative, and Debra Grate, in her Individual Capacity v. The Office of the Governor, et. al.*, Case No. 2018-CP-39-01274.

action. Plaintiff failed to depose any other defendants. Plaintiff even failed to depose Defendants Thomas Waring, Robert Kerr, and Christian Soura after this Court specifically held that Plaintiff could proceed with their depositions subject to certain limitations and extended the discovery deadline to accommodate these depositions. Although Plaintiff attempted to depose Haley and McMaster and subpoena records therefrom, those attempts were denied by this Court's order for various reasons. (ECF No. 196).

The above failure to conduct discovery in this action is particularly relevant as Plaintiff's counsel now requests that this Court defer ruling on the various dispositive motions and allow Plaintiff additional time to take discovery pursuant to Federal Rule of Civil Procedure 56(d). Because the motion to defer, if granted, would halt any further consideration of these summary judgment motions, the Court addresses it here before moving into the merits of each dispositive motion.

### **Plaintiff's Motion to Defer Ruling**

Initially, the relief Plaintiff seeks to invoke first requires the nonmovant to show "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). To the extent Plaintiff requests such relief in her motion for partial summary judgment, she is the movant and therefore Rule 56(d) is inapplicable to her. To the extent that she requests such relief in response to defendants' motions, she has failed to provide an affidavit or declaration as required by the federal rules. Thus, Plaintiff is not entitled to any deferral or additional discovery.

Even if the above procedures were followed, Plaintiff's request is still subject to denial on the merits. Plaintiff describes the information now sought as "newly discovered"

because "[a]t the meeting of the DDSN Commission held on February 18, 2021, then Director Poole disclosed an ongoing federal investigation being conducted by the United States Department of Health and Human Services OIG, indicating that the subject of that investigation involved matters occurring before she was hired in 2017 (during the lifetime of Valentine)." (ECF No. 225, p. 6). The information Plaintiff now seeks more time to collect was always available to learn during the original discovery period in this action.

Plaintiff requests this Court defer ruling to "allow time to obtain affidavits and declarations and reopen discovery to allow Plaintiffs to depose individuals who have 'resigned' or been terminated during the pending OIG investigation." (ECF No. 225, p. 11). However, Plaintiff offers no explanation as to why the resignation of certain individuals several years *after* Valentine's death has any relation whatsoever to the current litigation. Additionally, Plaintiff was free to depose and request information from each of these individuals—most of whom were defendants in this action[9]—during the pendency of the discovery period in this litigation. The fact that Plaintiff failed to conduct virtually any discovery—only to find out later that some of the defendants may possess relevant information pertaining to OIG investigations—does not justify the reopening of discovery. Doing so would only allow Plaintiff the opportunity to search for information now needed to defend against summary judgment after neglecting her duty to properly search for such

---

[9] Among others, Plaintiff specifically references Joshua Baker and Mary Poole as persons from which information may be sought. This Court prevented Plaintiff from deposing Baker and Poole only after the Court determined that Baker and Poole were protected from submitting to a deposition in this matter because Plaintiff's counsel did not timely file briefing as required in response to motions for protective orders. (ECF No. 187).

information during the discovery phase of this lawsuit. Respectfully, any relief Plaintiff has requested pursuant to Rule 56(d) is denied.

## III.    LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden and a properly supported motion is before the court, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 323. All inferences must be viewed in a light most favorable to the non-moving party, but the non-moving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

In the present case, it is appropriate to also note the following additional aspect of the summary judgment standard:

> *Celotex* made clear that Rule 56 does not require the moving party to negate the elements of the nonmoving party's case; to the contrary, "regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."

*Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 394 (4th Cir. 1994),

(quoting *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 885 (1990)).

## IV.    LAW APPLICABLE TO PLAINTIFF'S CAUSES OF ACTION

### a. Title II of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("Rehab Act")

With regard to discrimination, 42 U.S.C. § 12132 states:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

Additionally, under 42 U.S.C. § 12131(1); the definition of "public entity" means:

> (A) any State or local government;

> (B) any department, agency, special purpose district, or other instrumentality of State or States or local government; and

> (C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 24102(4) of Title 49).

> With regard to nondiscrimination under Federal grants and programs, 29 U.S.C. §

794 of the Rehab Act states:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

14

A "program or activity" means all of the operations of—

(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

(B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;

(2)(A) a college, university, or other postsecondary institution, or a public system of higher education; or

(B) a local educational agency (as defined in section 7801 of Title 20), system of career and technical education, or other school system;

(3)(A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship—

      (i)    if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or

      (ii)   which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or

(B) the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or

(4) any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3); any part of which is extended Federal financial assistance.

The ADA does not require that public entities provide "services of a personal nature, including eating, toileting, or dressing;" however, those states that elect to offer such services, are required to do so "in the most integrated setting appropriate to the needs of

qualified individuals with disabilities." 28 C.F.R. §§ 35.135, 35.130(d). This implementing regulation of the ADA is commonly referred to as the "integration mandate."

An analogous provision exists for § 504 of the Rehab Act and requires recipients of federal funds to "administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d). Because both the ADA and § 504 of the Rehab Act impose the same integration requirements, it is appropriate for the Court to consider both of these claims together. *Pashby v. Delia,* 709 F.3d 307, 321(4th Cir. 2013) ("We consider their Title II and section 504 claims together because these provisions impose the same integration requirements.").

The antidiscrimination requirement of Title II was specifically addressed in the Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), wherein the Court set forth that "unjustified institutional isolation of persons with disabilities is a form of discrimination." *Id*. at 600.

"To establish a prima facie retaliation claim under the ADA, plaintiffs must [show] (1) that they engaged in protected conduct, (2) that they suffered an adverse action, and (3) that a causal link exists between the protected conduct and the adverse action." *A Soc'y Without a Name, for People without a Home, Millennium Future-Present v. Virginia*, 655 F.3d 342, 350 (4th Cir. 2011).

### b. Violations of 42 U.S.C. § 1983 (civil action for deprivation of rights)

Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other

person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (internal citations omitted).

Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271, (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, (1979)). Although unclear from the pleadings, all parties appear to agree that, in this case, Plaintiff is using § 1983 as a vehicle for claims that defendants violated rights to equal protection and due process of law under the Fourteenth Amendment.

To establish supervisory liability under § 1983, a plaintiff must show:

(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (internal citations omitted).

### c. Violation of 42 U.S.C. § 1985 (conspiracy to interfere with civil rights)

Section 1985(3) states:

> If two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

To state a claim under 42 U.S.C. § 1985(3), a plaintiff must establish:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011).

### d. Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962

"To state a civil RICO claim, a plaintiff must allege that the defendants engaged in, or conspired to engage in, a '*pattern* of racketeering activity.'" *US Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010) (quoting 18 U.S.C. § 1962).

"The elements of a claim for the violation of the provisions of civil RICO are: 1) conduct [or predicate acts], 2) of an enterprise, 3) through a pattern, 4) of racketeering activity." *Green Ventures Int'l, LLC, P'ship v. Guttridge*, No. 2:10-CV-01709-MBS, 2010 WL 5019363, at *4 (D.S.C. Dec. 1, 2010) (citing *Sedima, S.P.R.L. v. Imrex, Co.,* 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L.Ed.2d 346 (1985)). "In addition, the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

18

## V.    DISCUSSION

At the outset, the Court would note that adjudicating the instant motions has been unduly complicated for several reasons. Specifically, each defendant has incorporated by reference not only every other defendant's motion, but also the prior arguments and discussions asserted previously in this action. Additionally, Plaintiff has incorporated by reference virtually every earlier argument and supporting document previously filed with this Court within her recent responses in opposition to the defendants' motions as well as her own motion. At one point, Plaintiff incorporates by reference no less than 15 other filings which encompasses hundreds of pages of arguments and thousands of pages of exhibits. (ECF No. 225, p. 5) ("Plaintiffs incorporate by reference the arguments made and exhibits attached to ECFs 61, 136, 137, 138, 140, 146, 150, 151, 164, 165, 182, 190, 199, 222 and 224."). Plaintiff even attempted to incorporate by reference arguments that were to be made in the future which prohibited certain defendants from being able to timely assert a complete reply. (ECF No. 222, p. 7). Plaintiff has additionally filed hundreds of pages of added exhibits, a large portion of which are irrelevant, yet fails to cite to specific pages or portions of such exhibits within her briefing. The Plaintiff's reiterative and superfluously elongated pleadings are inefficient and onerous. Nevertheless, the Court will wade through the arguments and decide each issue in turn.

### a.  Defendant Diane Anderson's Motion for Summary Judgment

As outlined above, Anderson is the only individual defendant alleged to have any direct contact with Valentine or Grate during Valentine's residency at Jewell Home. In her role as house manager, Anderson took care of staffing issues, policy implementation,

monthly reports and other paperwork, transportation to and from the day program and medical appointments, and other general management duties.

In response to Anderson's motion, Plaintiff concedes several of Anderson's contentions which obviates the need for discussion. Specifically, Plaintiff agrees that: (1) Plaintiff's equal protection claims are not applicable to Anderson because claims brought pursuant to the Medicaid Act are against the state agencies and their officials; (2) Plaintiff's supervisory liability claims under §1983 are not applicable to Anderson as they are asserted against other individual defendants; (3) Plaintiff's claims pursuant to the ADA and Rehab Act are not applicable to Anderson; (4) Plaintiff's claims pursuant to §1396(n)(c)(2) are not asserted against Anderson; and (5) any claims arising out of a failure to aggressively prosecute offenders are not asserted against Anderson.

Statute of Limitations

Next, Anderson argues that the statute of limitations should serve to limit any allegations against her for events occurring prior to April 2, 2015.[10] This Court has previously ruled on the applicable statute of limitations period in this action. In adjudicating the motions to dismiss, this Court held that South Carolina's general three-year statute of limitations for personal injury actions should be applied. (ECF No. 80, p. 19). Additionally, any claims raised on behalf of Valentine are subject to the five-year tolling provision in S.C. Code Ann. § 15-340. *Id.* Thus, Grate is barred from asserting any claims arising before April 2, 2015 in her personal capacity and any claims arising before

---

[10] This lawsuit was originally filed on April 2, 2018.

April 2, 2010 brought on behalf of Valentine's estate. However, it is unclear what claims, if any, in the SAC are limited by this ruling as all specific allegations pertaining to Valentine appear to occur after 2010 and those relating to Grate all appear to occur after 2015.

Plaintiff also asserts that the statute of limitations should be further extended by the so-called discovery rule[11] because defendants actively concealed information which would have given rise to claims. However, as stated above, the SAC appears only to allege specific acts occurring after 2010. Thus, application of the discovery rule is unnecessary here. Additionally, apart from bare allegations of active concealment of information, Plaintiff has set forth no support for her proposition that Anderson, or any other defendant, purposely hid information necessary to establish a viable claim. Plaintiff points to no specific acts or dealings that would be affected by application of the discovery rule. Thus, any request to further extend the statute of limitations based on the discovery rule is denied.

§ 1983 Claims

Having decided the applicable limitations period, the Court now turns to the substance of Anderson's remaining arguments.

First, Anderson argues that Plaintiff's § 1983 claims should be dismissed as Anderson never acted "under color of state law." Anderson argues that she was employed by PCDSNB, which is not an arm of the state for purposes of § 1983 actions.

---

[11] "Under the discovery rule, an action accrues when the injury is discovered or reasonably ought to have been discovered. The reasonably ought to have been discovered requirement is the reasonable diligence requirement." *Strong v. Univ. of S.C. Sch. of Med.*, 316 S.C. 189, 190–91, 447 S.E.2d 850, 851–52 (1994) (internal quotations and citations omitted).

There is no precise formula to determine whether otherwise private conduct constitutes state action for purposes of determining whether an individual acted under color of state law. *Arlosoroff v. NCAA*, 746 F.2d 1019, 1021 (4th Cir. 1984). "Nevertheless, several factors or circumstances bearing upon the issue of whether private conduct can fairly be attributed to the State for purposes of § 1983 liability have been clearly delineated by precedent." *Mentavlos v. Anderson*, 249 F.3d 301, 311 (4th Cir. 2001). Several of those factors are particularly relevant here. "State action has also been found in circumstances where the private actor operates as a willful participant in joint activity with the State or its agents, or when a nominally private entity is controlled by an agency of the State" *Id.* at 311 (cleaned up). "And, state action has been found where a private entity is entwined with governmental policies or the government is entwined in the management or control of a private entity." *Id.* Although not dispositive, the manner in which an entity is funded is also a factor to consider. *See Moore v. Williamsburg Reg'l Hosp.*, 560 F.3d 166, 179 (4th Cir. 2009).

Anderson argues that her employer, PCDSNB, "was created pursuant to a state law mandate and exists as a public entity, thus entitling it and its employees to the protections of the South Carolina Tort Claims Act;" but that it is an entity entirely distinct from the State. Plaintiff counters that PCDSNB was sufficiently intertwined with the State because PCDSNB was required to operate its program in compliance with rules and regulations established by DDSN and DHHS, which are also state agencies.

It appears that PCDSNB is an entity separate from the state agencies of DDSN or DHHS but is sufficiently intertwined so as to constitute an arm of the state for purposes of

a §1983 claim. PCDSNB, like all other county boards of disabilities and special needs, is a public entity created solely by statutory action. S.C. Code Ann. § 44-20-375. It is charged with "the administrative, planning, coordinating, and service delivery body for county disabilities and special needs services funded in whole or in part by state appropriations to the department[12] or funded from other sources under the department's control." S.C. Code Ann. § 44-20-385. Additionally, it is required to "represent the best interest of persons with intellectual disability, related disabilities, head injuries, or spinal cord injuries to the public, public officials, and other public or private organizations." *Id.* Additionally, certain state agencies exercise some control over county boards such as PCDSNB pursuant to state statutes. Therefore, PCDSNB can be considered an extension of the State itself. Accordingly, Anderson was "acting under color of state law" while employed as house manager at Jewell Home.

The remainder of Anderson's arguments essentially aver that Anderson's alleged actions may be violative of state law, but do not rise to the constitutional magnitude necessary to support a § 1983 cause of action.

Plaintiff's claims against Anderson can be categorized as follows: (1) allegations of direct abuse including burning Valentine with a cigarette, slapping, pulling Valentine's hair and verbally abusing Valentine; (2) failing to adequately inform Grate that Valentine was allowed to live with Grate and Grate could possibly qualify to receive financial assistance

---

[12] "Department" means the South Carolina Department of Disabilities and Special Needs. S.C. Code Ann. § 44-20-30(6).

in exchange for providing care for Valentine; and (3) failing to seek necessary consents from Grate and provide Grate with Valentine's medical information.

Anderson avers that these damages are covered by various state torts claims and therefore a §1983 action against is inappropriate.

> The Fourteenth Amendment's Due Process Clause protects a set of interests—life, liberty, and property—that are also protected by state tort law. Together with § 1983, then, there is some risk of the Clause supplanting state tort law in almost any suit alleging that a local official has caused harm. In case after case, the Supreme Court has rejected this prospect and spurned any approach to the Fourteenth Amendment that would make it "a font of tort law to be superimposed upon whatever systems may already be administered by the States."

*Waybright v. Frederick Cty., MD*, 528 F.3d 199, 204 (4th Cir. 2008) (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)).

In expounding on interests protected by the Fourteenth Amendment, the Fourth Circuit has stated one important principal

> involves a certain sense of constitutional magnitude—a sense that, as due process at the core combats arbitrary action of government, applying the Clause to the ordinary run of governmental neglect, inaction, and bad policy would diminish it. Thus, we find the Court remarking that only the most egregious official conduct can be said to be arbitrary in the constitutional sense.

*Waybright v. Frederick Cty., MD*, 528 F.3d 199, 204 (4th Cir. 2008)(cleaned up).

Additionally, "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." *Jean v. Collins*, 221 F.3d 656, 660 (4th Cir. 2000) (quoting *Daniels v. Williams*, 474 U.S. 327, 328 (1986)). "Indeed, negligent conduct cannot by definition establish the 'affirmative abuse of power' necessary to constitute a due process deprivation." *Id.*

In response, Plaintiff suggests that the allegations against Anderson constitute deprivations of rights secured by the Fourteenth Amendment which have been clearly established for some time. Plaintiff specifically cites to *Zinermon v. Burch*, 494 U.S. 113, 133 (1990) and *Youngberg v. Romeo*, 457 U.S. 307 (1982) to support this proposition.

In *Youngberg*, the Supreme Court held that an involuntarily committed, intellectually disabled, individual enjoyed "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." *Youngberg* at 324. The Court further stated that the "State also has the unquestioned duty to provide reasonable safety for all residents and personnel within the institution." *Id.* However, the Court also cautioned that a "decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.*

In *Zinermon,* an involuntarily committed individual with a mental health condition likewise raised due process claims.[13] There, the Supreme Court held that "overlapping state remedies are generally irrelevant to the question of the existence of a cause of action under § 1983." *Zinermon v. Burch*, 494 U.S. 113, 124 (1990).

> This general rule applies in a straightforward way to two of the three kinds of § 1983 claims that may be brought against the State under the Due Process Clause of the Fourteenth Amendment. First, the Clause incorporates many of

---

[13] The Court would note that the "broader question[] of what procedural safeguards the Due Process Clause requires in the context of an admission to a mental hospital" was not presented nor decided in that case. *Zinermon v. Burch*, 494 U.S. 113, 117 (1990).

the specific protections defined in the Bill of Rights. A plaintiff may bring suit under § 1983 for state officials' violation of his rights to, e.g., freedom of speech or freedom from unreasonable searches and seizures. Second, the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions "regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S., at 331, 106 S.Ct., at 664. As to these two types of claims, the constitutional violation actionable under § 1983 is complete when the wrongful action is taken. *Id.*, at 338, 106 S.Ct., at 678 (STEVENS, J., concurring in judgments). A plaintiff, under *Monroe v. Pape*, may invoke § 1983 regardless of any state-tort remedy that might be available to compensate him for the deprivation of these rights.

*Id.* at 125.

Here, the allegations of direct abuse by Anderson likely constitute claims under South Carolina state tort law.[14] However, these abusive actions, if true, are also those which could constitute "the most egregious official conduct [which] can be said to be arbitrary in the constitutional sense." *Waybright v. Frederick Cty., MD*, 528 F.3d 199, 204 (4th Cir. 2008). Because Anderson's alleged intentional actions of slapping, pulling hair, verbal abuse, and burning with a cigarette could be seen as violations of those constitutionally protected interests in conditions of reasonable care and safety, a genuine issue of material fact exists as to whether Anderson's actions rise to the magnitude of a deprivation of a constitutional right. Such rights being those secured by the Fourteenth Amendment as outlined in *Zinermon* and *Youngberg*. Thus, Anderson's motion for summary judgment must be denied as to these claims.

---

[14] Indeed, Plaintiff has pending a separate parallel action in South Carolina state court alleging such claims. *See Estate of Latoya Nicole Valentine, by and through Debra Grate, Personal Representative, and Debra Grate, in her Individual Capacity v. The Office of the Governor, et. al.*, Case No. 2018-CP-39-01274.

However, the same cannot be said for Plaintiff's allegations based on Anderson's failure to adequately inform Grate that Valentine was allowed to live with Grate; that Grate could possibly qualify to receive financial assistance in exchange for providing care for Valentine; that Anderson failed to seek necessary consents from Grate; or that Anderson failed to provide Grate with Valentine's medical information. These actions, at most, constitute negligence and therefore cannot serve as the basis for a §1983 claim.

Specifically, Plaintiff averred that Anderson erroneously believed that Cunningham was Valentine's legal guardian and treated her as such to the exclusion of Grate. Plaintiff cites to § 44-66-30(A) of the South Carolina Adult Health Care Consent Act to outline the priority of potential health care decision makers for incompetent adults. Relevant here, this order of priority includes: (1) guardians appointed by the court; (5) a parent of the patient; (6) an adult sibling of the patient; or (8) any other adult relative. *Id.* Plaintiff avers that whether Valentine's father William or Grate was the proper person to make such decisions is a genuine issue of material fact for the jury to decide.[15] In either regard however, Grate maintains it was improper to consider Cunningham the proper person with priority to make decisions on Valentine's behalf.

---

[15] Apart from Grate's assertion that William failed to provide financial support for Valentine or provide care for her in his home prior to entering PCDSNB, there is no evidence in the record to show that William ever relinquished his parental rights over Valentine. Anderson testified that William continued to visit Valentine 3 to 4 times a year while at Jewell Home. (ECF No. 222-4, p. 11). She also testified that Grate visited 2 to 3 times a year. (ECF No. 222-4, p. 27). Thus, there appears to be no genuine issue of material fact on this point as William had proper authority that was never relinquished. Grate even acknowledged this fact by testifying that she sought permission from William before seeking to remove Valentine from Jewell Home. (ECF No. 224-23, p. 31-32). However, this determination does not affect the Court's ultimate conclusion that Anderson reasonably believed Cunningham was the proper guardian.

27

However, at no point does Plaintiff claim that Anderson knew Cunningham was not the proper guardian and deliberately chose to ignore that designation to Grate's exclusion. It is uncontested that Cunningham was making decisions and executing documents as Valentine's guardian since the time Valentine was initially placed into PCDSNB's care in 1997. By the time Anderson began working as house manager at Jewell Home in 2008, Cunningham had been acting as Valentine's guardian for over a decade and all documentation available to her identified Cunningham as the appropriate guardian. William and Grate were both aware of this fact and apparently acquiesced to Cunningham's supervision over Valentine. Thus, Anderson had a good-faith belief that Cunningham was the proper party to make decisions on behalf of Valentine and that Cunningham was likewise the individual entitled to receive updates concerning Valentine's medical status. (ECF No. 222-4, p. 8).

Because Anderson acted in good faith in her belief that Cunningham was Valentine's proper legal guardian, she cannot be said to have violated Grate's constitutional rights. *See Jean v. Collins,* 221 F.3d 656, 660 (4th Cir. 2000) ("it would be impermissible to hold the [defendant] liable for due process violations under § 1983 where they have acted in good faith."). At most, Anderson's actions can only be said to have been negligent. As stated above, "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 328 (1986).

Because Anderson reasonably believed Cunningham was Valentine's proper legal guardian, Anderson was entitled to rely on Cunningham's consents and approvals to

28

Valentine's plan of care. Specifically, Cunningham gave written consent to PCDSNB to provide routine medical and dental treatment along with emergency medical treatment if necessary. (ECF No. 198-2, p. 6). Cunningham also acknowledged that she had a right to receive copies of Valentine's medical records if requested. (ECF No. 198-2, p. 13). Additionally, Cunningham signed over the control of Valentine's Medicaid benefits when presenting Valentine to PCDSNB for care and approved of her financial plans. Anderson testified that Cunningham was well informed of Valentine's status, was updated when Valentine received emergency medical treatment[16] or a change in medication, and was consulted for approval when Valentine's various care plans were updated.

Plaintiff has presented no evidence to show Cunningham was not so informed. Thus, any claims arising from Grate's allegations that she was not consulted or informed of Valentine's medical conditions must be dismissed because Anderson reasonably believed Cunningham, and not Grate, was the proper person entitled to such information. Likewise, Anderson was not obligated to inform Grate of any feasible alternatives to Valentine's care.

As an extension of the above argument concerning consent for medical care, Grate also asserts that Anderson fraudulently listed herself of Valentine's "next of kin" when seeking medical treatment in an effort to avoid detection of medical problems. Anderson counters that she never signed medical consents as Valentine's "next of kin." Some hospital forms list Anderson under a "next of kin" heading, but list her relationship as "other." (ECF No. 222-2, p. 1). These forms were not signed by Anderson, but simply list her name. Other

---

[16] This included informing Cunningham of Valentine's hyponatremia diagnosis and a hospital visit to treat this condition.

forms are signed by Anderson as "patient designee/representative" or "guardian" and Anderson used the label "HSMGR." (presumably short for house manager). (ECF No. 222-2, p. 3-5). Again, Anderson had written consent from Cunningham to authorize routine and emergency medical services for Valentine. Moreover, Anderson testified that she advised Cunningham of emergency medical treatment shortly after it occurred. (ECF No. 222-4, p. 7). Thus, Plaintiff's bare allegations on this point fail to present a genuine issue of material fact when comparing the dearth of evidence presented by Plaintiff in response to Anderson's documentation.

Additionally, Grate avers Anderson abused Valentine by "chemically restraining" her. It appears this contention is based on various medications provided to Valentine throughout her residency at Jewell Home. Despite Plaintiff's assertions, each of these medications was prescribed by a licensed physician after an independent medical assessment. (ECF No. 198-6). Plaintiff has failed to offer any evidence as to why these medications may have been unreasonable or otherwise shown that Anderson exercised any independent discretion in administering these medications. Thus, these claims must also fail.

Plaintiff also offers allegations of "financial exploitation" of Valentine while residing at Jewell Home. Plaintiff specifically alleges Valentine's funds were improperly used to purchase several boxes of paper, a pre-need funeral contract, copays for dental services that should have been paid by Medicaid, sunscreen, and overcharging Plaintiff for room and board. Plaintiff has offered no evidence to show that Valentine was overcharged for room and board such as how much she allegedly overpaid. Thus, this contention must

fail. As to all other purchases, Plaintiff has failed to offer any evidence indicating that they were not legitimate expenses for Valentine. Anderson does not dispute that several boxes of paper were purchased with Valentine's funds. However, Anderson avers that this paper was purchased as art supplies for Valentine as she enjoyed coloring, drawing, and stapling papers together. This paper was reserved exclusively for Valentine's use and purchased in conjunction with other art supplies such as staples, crayons, and a pencil sharpener. (ECF No. 223-1). Plaintiff has failed to present any evidence that the paper and art supplies were used for anything other than Valentine's enjoyment.[17]

As to the purchase of sunscreen for Valentine, Plaintiff avers that she was rarely in the sun. Apart from this bare statement in her motion, Plaintiff has presented absolutely no evidence of the time Valentine spent in the sun, how much sunscreen she required, or that this sunscreen was used for any purpose other than Valentine's personal use. Additionally, Anderson submits that the dental copays were for sedation services not covered by Medicaid.[18] Valentine required sedation for routine dental services and records show she was charged $500 for these copays on several different occasion. (ECF No. 223-1). Again, Plaintiff has provided no evidence to show Valentine's funds were exploited by paying for her own dental care. Also, there is no evidence expounding on Valentine's request to purchase a pre-need funeral contract. There is no evidence Anderson persuaded Valentine

---

[17] Documentation provided by Plaintiff clearly states personal items such as magazines, books, or stationary are the consumer's responsibility. (ECF No. 222-1, p. 89).

[18] Documentation provided by Plaintiff clearly states that dental services not allowed by Medicaid/Medicare funding are the consumer's responsibility. (ECF No. 222-1, p. 88).

to make such a request or forced Valentine to use funds against her will. Accordingly, Plaintiff has failed to present evidence which would show a genuine issue of material fact supporting allegations of "financial exploitation." Thus, these claims must be dismissed.

Grate also avers that she herself was retaliated against when Anderson forced her to seek approval from Cunningham and William prior to allowing Valentine to leave Jewell Home. As stated above, Anderson reasonably believed Cunningham was the individual responsible for approving Valentine's departure from PCDSNB. Additionally, there is no indication any defendant "forced" Grate to seek any prior approvals as Grate voluntarily sought approvals from William and Cunningham. (ECF No. 224-23, p. 31–32). Additionally, Grate encountered no opposition in seeking those consents and William promptly executed paperwork allowing Valentine to leave. Thus, Plaintiff has failed to show any damages from this alleged retaliation and this contention is without merit.

Grate testified that Anderson also retaliated by accusing Grate's husband of sleeping with Valentine on an overnight visit shortly after Grate reported the alleged cigarette burn on Valentine's chest. Apart from Anderson and Grate discussing these allegations on one phone call, there is no other evidence of an "investigation."[19] Anderson also testified that these allegations originated from an individual at Valentine's day program—not from Jewell Home. Plaintiff has offered no evidence of these allegations or investigation other than recounting the one phone call with Anderson. Even if there was a so-called

---

[19] PCDSNB records indicate that the call to Grate was the only action taken in regard to these allegations because Valentine had "made untruths many times before and sometimes would not answer truthfully." (ECF No. 205-8, p. 7).

"investigation," it obviously yielded no negative results as Grate never heard any more on the matter after the phone call. (ECF No. 224-23, p. 97). Moreover, other than averring a close proximity in time, Grate has failed to show these allegations were manufactured as a result of her report of the alleged burn. Thus, there is no evidence of a causal link between Grate's allegations of a burn and the report of Valentine sleeping with Grate's husband. Defendants have presented evidence that Valentine made statements to employees other than Anderson in which Valentine stated she slept with other men and that this prompted the so-called investigation. Thus, Grate has failed to present evidence of any retaliation or damages resulting therefrom. Thus, these claims must likewise fail.

Qualified Immunity

Anderson also avers she is entitled to qualified immunity from all of Plaintiff's claims because she never violated a clearly established constitutional right. Qualified immunity shields government officials as long as the conduct complained of does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Weller v. Dep't of Soc. Servs. for City of Baltimore*, 901 F.2d 387, 398 (4th Cir. 1990). As stated earlier in this Order, Anderson cannot be liable under § 1983 for any of her alleged actions apart from those allegations of direct assault or abuse of Valentine. Thus, qualified immunity as to those previously dismissed claims is unnecessary. As to the claims of direct abuse, the cases cited above clearly establish that an individual committed to the custody of a state agency "enjoys constitutionally protected interests in conditions of reasonable care and safety, [and] reasonably nonrestrictive

confinement conditions." *Youngberg v. Romeo*, 457 U.S. 307, 324–25 (1982).[20] Although Valentine was not involuntarily committed like the plaintiff in *Youngberg*, this Court is still of the opinion that because PCDSNB assumed care for Valentine, she was entitled to some level of constitutionally protected interests. Because these rights were established prior to the actions alleged here, Anderson was on notice of Valentine's clearly established constitutional right to reasonable care and safety. Thus, she is not entitled to qualified immunity for any intentional actions of abuse or assault against Valentine.

However, the remainder of Plaintiff's claims, including those relating to any failure to inform or gather consents from Grate, must be barred by qualified immunity even if they were not otherwise dismissed above. Qualified immunity protects individuals "from personal liability for civil damages stemming from bad guesses in gray areas and ensures that they are liable only for transgressing bright lines." *Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 468 (4th Cir. 2013) (citations omitted). Plaintiff has presented no evidence that Valentine had a constitutional right to be free from an erroneous belief in one's legal guardianship. Because Valentine did not have a constitutional right to be free from merely negligent decision making, Anderson is entitled to qualified immunity as to

---

[20] *Youngberg v. Romeo*, 457 U.S. 307, 324–25 (1982) also stated that "[i]n determining whether the State has met its obligations in these respects, decisions made by the appropriate professional are entitled to a presumption of correctness. Such a presumption is necessary to enable institutions of this type—often, unfortunately, overcrowded and understaffed—to continue to function. A single professional may have to make decisions with respect to a number of residents with widely varying needs and problems in the course of a normal day. The administrators, and particularly professional personnel, should not be required to make each decision in the shadow of an action for damages."

all other claims asserted by Grate in her individual capacity or those asserted on behalf of Valentine.

In summary, Anderson is entitled to summary judgment for all claims asserted against her other than those of intentional abuse or assault against Valentine. Because a genuine issue of material fact exists as to whether Anderson physically assaulted Valentine, verbally abused her, or burned her with a cigarette, Plaintiff's cross-motion for summary judgment on these claims must be denied. To the extent that any of Plaintiff's other claims are not specifically addressed above, Plaintiff has failed to present a genuine issue of material fact on those matters and they are thus dismissed.

### b.  PCDSNB, Thena and Owens' Motion for Summary Judgment

As stated above, PCDSNB operated Jewell Home where Valentine resided during the allegations of abuse. Thena served as PCDSNB director and Owens served as assistant director. There are no allegations of direct contact between Thena or Owens and Valentine. Accordingly, it appears that all allegations of wrongdoing stem from Anderson's interactions with Valentine and Grate.

<u>ADA and Rehab Act Claims</u>

Initially, these defendants argue that the statute of limitations period for Plaintiff's ADA claims should be shortened to one year pursuant to the South Carolina Human Affairs law. As stated above, this Court has already determined the applicable statute of limitations. "South Carolina's general three-year statute of limitations applies to Plaintiffs' ADA and Rehabilitation Act claims, and it is further tolled for five years under S.C. Code

Ann. § 15-3-40." (ECF No. 80, p. 24). The Court declines the invitation to revisit this decision.

Next, PCDSNB avers that Plaintiff has presented no evidence to support her ADA and Rehabilitation Act claims. Specifically, PCDSNB avers "Plaintiffs allege that they were not informed of or were denied services by PCDSNB but have no evidence that the services were either requested or that the request had been acted on – or both." (ECF No. 206-1, p. 4). Plaintiff counters that there is a factual issue as to who had priority under the state statute to make decisions for Valentine and therefore Grate should have been making medical decisions and kept informed. However, as discussed above, Anderson and all other defendants had a reasonable, good-faith belief that Cunningham was Valentine's legal guardian. Additionally, Grate has failed to present any evidence as to why she should have been advanced in priority over William. Thus, Grate cannot maintain an action against PCDSNB based on any failure to obtain consent from Grate or otherwise inform her of any alternatives in care, including home-based services. At all times prior to this litigation, all parties believed Cunningham was the individual entitled to such information.

Further, Plaintiff has pointed to no evidence in the record as to what Cunningham was or was not specifically informed of with regard to Valentine. The only evidence shows that Anderson informed Cunningham of Valentine's medical conditions and routinely sought approval from Cunningham for Valentine's updated plans of care. Anderson even took Valentine and the forms directly to Cunningham's home so that she could approve the updates to Valentine's care. Additionally, Cunningham executed forms which clearly delineated certain of Valentine's rights including the "right to live and receive services in

36

the least restrictive place that is available" and "the right to ask for a discharge." (ECF No. 198-2, p. 2). Cunningham also executed forms acknowledging she had been informed of feasible alternatives and given the opportunity to choose between home and community-based services. (ECF No. 239-1, p. 10). Thus, the only evidence in the record shows that Cunningham was advised of these rights at the same time as Valentine. Nevertheless, Cunningham turned Valentine over to the care of PCDSNB because neither she, nor Grate, could provide the requisite care for Valentine.

Grate avers that had she known that she could have been compensated for providing care for Valentine in her home, she would have quit her job and taken Valentine into her home. However, as stated above, none of the defendants had a duty to inform Grate of these alternatives as they believed Cunningham to be the legal guardian. Additionally, Grate has offered no evidence that she qualified for such compensation[21] or that providing care for Valentine would have compensated her enough to terminate her current employment and care solely for Valentine. Additionally, providers such as DSN Boards, and Contracted Service Providers are under no obligation to hire relatives/family members to provide service. Thus, any claim for damages stemming from a failure to inform Grate of the

---

[21] SCDDSN policies state that "relatives/family members who are paid for care/services must meet all South Carolina Medicaid provider qualifications." (ECF No. 205-18, p. 3). Although Plaintiff asserts that whether she met the qualifications to provide Medicaid funded care in her home is a question for the jury, Grate has provided no evidence showing she met any such qualifications. Merely stating that an issue is one of fact for the jury to decide will not suffice. Plaintiff must set forth some admissible evidence to support her claims. Thus, Plaintiff has failed to meet her burden of setting forth a genuine issue of material fact as to this issue.

alternative to live in a less restrictive setting, such as with one's family, is pure speculation and cannot support a claim here.

The SAC also makes multiple references to improper limits or caps for services and a diversion of funds meant to provide benefits for Medicaid recipients such as Valentine. However, Plaintiff has offered no evidence of any benefits that were requested by Valentine and denied. There is no indication that Valentine's services were reduced pursuant to statutory caps or that any benefits were denied. There is no evidence that Jewell Home was underfunded or understaffed. Even if Plaintiff could show some causal connection as to funding decisions and Valentine's damages, there is no evidence that PCDSNB was responsible for developing the system of funding for disability services. Thus, Plaintiff has not provided any evidence that would create a genuine issue of material fact as to whether an ADA or Rehab Act violation occurred.

Additionally, "[c]ompensatory damages are not available under Title II of the ADA absent a showing of discriminatory intent." *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1146–47 (11th Cir. 2014). Here, there is no evidence that PCDSNB intentionally discriminated against Grate or Valentine. As discussed in depth above, there is no indication that any defendant had knowledge that Cunningham was not Valentine's proper guardian and yet chose to deliberately act in contravention of that knowledge. Thus, there is no evidence of any intentional discriminatory actions. There is also no evidence that services were not provided solely based on Valentine's disability. At most, any failure to inform the correct guardian of the availability of home-based services was negligent and not intentional.

Plaintiff does not dispute that she must show intentional discrimination, not mere negligence. Rather, Plaintiff avers that "intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1152 (10th Cir. 1999).[22] "Defendants intentionally violate the ADA and the Rehabilitation Act by demonstrating deliberate indifference when they have notice of the potential risk of their decision, and clearly refuse the accommodation knowingly." *Adams v. Montgomery Coll. (Rockville)*, 834 F. Supp. 2d 386, 394 (D. Md. 2011) (cleaned up). "[C]ompensatory damages are available for failure to accommodate a plaintiff if defendants acted knowingly, voluntarily, and deliberately, even if the violations resulted from mere thoughtlessness and indifference rather than because of any intent to deny Plaintiff's rights." *Id.* "In order to prove deliberate indifference, 'a plaintiff must show that the defendant knew that harm to a federally protected right was substantially likely and failed to act on that likelihood.'" *Bone v. Univ. of N. Carolina Health Care Sys., No.* 1:18CV994, 2021 WL 395547, at *2 (M.D.N.C. Feb. 4, 2021) (quoting *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 831 (11th Cir. 2017)). However, even when applying a deliberate indifference standard, Plaintiff has still failed to present a

---

[22] Although it does not appear that the Fourth Circuit has specifically held that a finding of deliberate indifference will satisfy the intentional discrimination standard, case law seems to suggest it would support such a proposition. *Bone v. Univ. of N. Carolina Health Care Sys.*, No. 1:18CV994, 2021 WL 395547, at *2 (M.D.N.C. Feb. 4, 2021) ("While the Fourth Circuit has not specifically addressed the standard required for proving intentional discrimination, the majority of circuits to have decided the issue have adopted a deliberate indifference standard, as have some district courts within the Fourth Circuit.").

genuine issue of material fact which would warrant denying her motion for summary judgment.

Specifically, Plaintiff has failed to show that any defendant knew Cunningham was not the proper guardian yet failed to take any remedial action. Additionally, Plaintiff avers that regardless of who the proper guardian was, PCDSNB knew Valentine had a right to live in the least restrictive setting, i.e. Grate's home, and yet refused such an accommodation. Plaintiff cites to a 2003 behavior support plan wherein Valentine stated "I want to go live with my sister" after exerting acts of physical aggression toward staff and peers. (ECF No. 246-2, p. 1). This single "tearful statement" does not constitute a formal request to leave PCDSNB care as there is no indication as to whom the statement was made or when. Additionally, these statements were made prior to Valentine's residence at Jewell Home. Moreover, as stated above, Grate was not Valentine's legal guardian and was not entitled to be informed of Valentine's feasible alternatives even if Valentine made such a request.

Plaintiff also asserts retaliation claims against these defendants after Grate reported the alleged cigarette burn by; (1) alleging that Valentine was sleeping with Grate's husband on home visits; and (2) refusing to allow Valentine to be discharged without authorization from her Aunt Cunningham, then requiring Grate to obtain permission from Valentine's father, William, who abandoned her as a child. These arguments fail for the same reasons discussed above in relation to Anderson's summary judgment motion. Thus, Plaintiff's ADA and Rehab Act claims against these defendants are dismissed.

§ 1983 Claims

Paragraph 115 of Plaintiff's SAC states: "Elaine Thena, John Owens, and Diane Anderson, in their individual and official capacities and PCDSNB violated Plaintiffs' statutory and constitutional rights under color of state law." As previously held by this Court, agencies such as PCDSNB are not "persons" amenable to suit under § 1983. Additionally, official capacity claims against Owens or Thena fail for the same reason. A state official cannot be sued in his official capacity for damages under § 1983. *Will v Michigan Sept. of State Police*, 491 U.S. 58, 71 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."). Thus, any § 1983 actions against PCDSNB or Thena and Owens in their official capacities must fail as a matter of law. Regardless, as explained below, Plaintiff has failed to show a genuine issue of material fact as to this claim and it must therefore be dismissed.

The allegations of Fourteenth Amendment violations asserted here mirror those asserted against Defendant Anderson above. Consequently, defendants PCDSNB, Thena and Owens assert nearly identical arguments in support of their motion for summary judgment. For the reasons asserted above, any claims based on failure to inform Grate or seek consent from Grate must fail. Additionally, there are no allegations, let alone evidence, indicating that either Thena or Owens[23] had any direct contact with Valentine or

---

[23] Grate did reference Owens in her deposition as an individual she discussed the alleged cigarette burn with. However, there is no evidence Owens had any direct contact with Valentine or otherwise violated her constitutional rights.

Grate. Thus, those allegations of abuse and assault against Anderson above that survived summary judgment are inapplicable here. Additionally, Thena and Owens are entitled to qualified immunity for the same reasons Anderson is entitled to qualified immunity discussed above.

To the extent Plaintiff argues supervisory liability, she has presented no evidence of any knowledge possessed by Thena or Owens which would warrant action. Although Grate alleges she spoke with Owens regarding the alleged cigarette burn, this single interaction does not show Owens engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury. Additionally, Plaintiff has offered no evidence showing an affirmative causal link from any inaction of Thena or Owens to Plaintiff's injuries. The one incident Thena or Owens would have been aware of, i.e. the alleged March 31, 2017 assault, resulted in Anderson's suspension and ultimate termination. Thus, Plaintiff has failed to present a genuine issue of material fact as to this claim.

§ 1985 Claims

Initially, these defendants assert that the disabled are not a class for purposes of 42 U.S.C. § 1985(3) claims. The Court declined to rule on this argument when initially presented at the motion to dismiss stage but must make a determination now.

The parties agree that neither the United States Supreme Court nor the Fourth Circuit Court of Appeals have had the occasion to address this issue and there is a split among the circuits. *See Freyre v. Hillsborough Cty. Sheriff's Office*, No. 8:13-CV-02873-T-27, 2014 WL 6885913, at *13 (M.D. Fla. Dec. 5, 2014) ("Circuit courts that have ruled

on the question are split, with the Second, Third, and Eighth Circuits holding they are, and the Sixth, Seventh, and Tenth Circuits holding they are not.").

However, this Court is in agreement with several other district courts in this Circuit that disabled individuals are not a class for purposes of § 1985. *See King v. PEM Properties*, No. 2:16-CV-09876,  2019 WL 6194639 (S.D.W. Va. Nov. 20, 2019) ("However, 'disabled veterans,' the class to which Plaintiff alleges he belongs, are not protected under the statute."); *Cloaninger v. McDevitt*, No. 106CV135, 2006 WL 2570586, at *7 (W.D.N.C. Sept. 3, 2006) ("Neither in the plain language of the statute, the Congressional record, nor the decisions of any court can this court find any authority, intent, or basis for extending the protections of Section 1985(3) to disabled veterans."); *see also Harrison v. KVAT Food Mgmt., Inc.,* 766 F.2d 155, 161 (4th Cir. 1985) (noting that existing precedent "exhibits a noticeable lack of enthusiasm for expanding the coverage of § 1985(3) to any classes other than those expressly provided by the Court."). Because the Fourth Circuit has not expressly expanded coverage of § 1985(3) claims to disabled persons, this Court will not seek to expand it here. Thus, Plaintiff's § 1985 claim must fail as a matter of law as to all defendants.

Although further disposition of any § 1985 claim is no longer necessary, this Court will nevertheless briefly address defendants' alternate arguments as additional sustaining grounds.

These defendants assert that there is no evidence Thena and Owens ever participated in a conspiracy to deprive Valentine of her constitutional rights. The Court agrees that Plaintiff has failed to set forth any evidence to support these allegations. The record

contains no specific identification of any conspiratorial acts and Plaintiff has not alleged any specific actions with regard to Thena or Owens to support this claim.

Plaintiff counters that Thena entered into a contract with Defendant Barfield to provide pharmacy services, wherein Barfield received a kick-back, a percentage, based upon the cost of the pharmaceuticals provided to Valentine—provided without any consent from an authorized person. This is not an accurate reflection of Barfield's testimony. (ECF No, 224-18, p. 185-197). Barfield testified he was paid a bonus by Long's Pharmacy when PCDSNB switched its preferred pharmacy to Long's Pharmacy. Barfield was working for Long's at the time.[24] There is no evidence to show these actions were meant to deprive Valentine of "equal enjoyment of rights secured by the law to all." Additionally, Plaintiff has failed to show any damages resulting from this alleged conspiracy because the cost for medication to PCDSNB consumers, including Valentine, never changed. Her pharmacy costs remained the same even after she went home with Grate and switched her pharmaceutical provider to Wal-Mart. At all times, her medications were free. There are no damages here.

Plaintiff also alleges that Defendants Thena and Owens conspired with Defendant Waring to divert funds allocated to pay for services provided to disabled persons to build a dormitory on land owned by a religious college, in violation of the South Carolina

---

[24] The anti-kickback statute cited by Plaintiff, 42 U.S.C. § 1320a-7b(b), includes a safe harbor provision for payments made by an employer to a bona fide employee. *United States v. Sanjar*, 876 F.3d 725, 747 (5th Cir. 2017) ("The statute has a safe harbor for payments to bona fide employees for their provision of otherwise covered services, like recruiting patients."). There is nothing in the record to indicate Barfield was not a bona-fide employee.

Constitution, while the PCDSNB was understaffed by 31 persons. There is no indication any of this had any effect on Valentine or Grate and is irrelevant here. There is no evidence that Jewell Home itself was understaffed or underfunded. There is no evidence Valentine requested services that were denied, let alone denied due to lack of funding. There is no evidence that Grate was ever harmed by a lack of funding. Thus, Plaintiff's allegations on this point likewise fail.

Additionally, a vital element of any § 1985 claim is that the defendants must be motivated by a specific class-based insidiously discriminatory animus. Plaintiff has offered no evidence to support this element other than merely reciting it within her briefs.

Furthermore, to the extent Plaintiff alleges a conspiracy between Thena and Owens themselves, such a claim is barred by the intracorporate immunity doctrine. *Anthony v. Ward*, 336 F. App'x 311, 315 (4th Cir. 2009) (addressing doctrine in state law context); *Buschi v. Kirven*, 775 F.2d 1240, 1251 (4th Cir. 1985) (recognizing doctrine in § 1985 context). However, because the allegations of conspiracy above include defendants from other state agencies, the intracorporate immunity doctrine is inapplicable to those claims.

<u>RICO Claims</u>

Simply put, Plaintiff has presented no evidence of an enterprise or that Thena and Owens were employed by or associated with an enterprise carrying out a pattern of racketeering activity. Plaintiff fails to address the RICO argument in her response and has thus failed to present a genuine issue of material fact. Thus, all RICO claims as to these defendants must be dismissed.

Consequently, PCDSNB, Thena, and Owens' motion for summary judgment is granted in full. For the same reasons, Plaintiff's cross-motion for summary judgment is denied as to these defendants.

### c. SCDHHS, Baker, and Soura's Motion for Summary Judgment

SCDHHS is the state entity charged with administering all Medicaid programs in South Carolina. Baker is the current SCDHHS director having been appointed to that position after Valentine died. He previously served as deputy chief of staff for budget and policy for former Governor Nikki Haley. Soura was the prior director of SCDHHS.

ADA and Rehab Act Claims

These defendants first argue that Plaintiff lacks standing to assert an ADA claim against SCDHHS. Here, defendants essentially argue that all evidence indicates Valentine was happy with her living arrangements at Jewell Home in addition to the medical care she received. Consequently, she never requested to leave, let alone faced a denial of any such request. These defendants contend that there is no evidence of any ADA violation or damages necessary for standing.

Plaintiff counters that the defendants had the obligation under *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), to affirmatively inform Valentine and her legal guardian of feasible alternatives such as in-home care without requiring Valentine to first request such an alternative. Accordingly, Plaintiff has shown she has standing to assert such an argument.

However, as discussed above and reiterated below, each defendant reasonably believed Cunningham was Valentine's legal guardian. Because Plaintiff has failed to offer

any evidence showing what information of reasonable alternatives Cunningham was or was not informed of, Plaintiff has failed to create a genuine issue of material fact as to these claims. Additionally, these defendants argue Plaintiff has failed to show a causal connection as to any of their actions and Valentine's death, and this Court agrees. As stated earlier, the Court agreed with the Coroner's cause of Valentine's death, and not Plaintiff's unsupported assertion of hyponatremia. Thus, Valentine's death cannot be an element of damages or support any claim for relief.

Next, SCDHHS asserts that Plaintiff has presented no evidence of an ADA or a § 504 Rehab Act violation. Initially, SCDHHS argues that it had no duty to inform Valentine or her guardian of feasible alternatives of care because she was not institutionalized while in Jewell Home and had no risk of institutionalization.[25] However, the Court need not adjudicate this specific argument[26] as Plaintiff has failed to present evidence of any violation assuming that such a duty did exist.

---

[25] SCDHHS cites to the case of *Ball v. Rodgers*, 492 F.3d 1094, 1107 (9th Cir. 2007) to stand for the proposition that "under § 1396n(c)(2)(C): (a) if the participant is not faced with having to receive service in a traditional, long-term institutional setting, like Valentine, then there can be no requirement under (b) to provide a feasible alternative to the institutional care as there is no choice for the participant to make."

[26] The Court would note that there is some conflicting precedent as to defining what constitutes an institution for purposes of *Olmstead*. The Fourth Circuit has previously agreed that "Adult Care Homes" in North Carolina that provide services to disabled adults who "require 'assistance' or 'limited supervision' with regard to one of seven ADLs: bathing, dressing, personal hygiene, ambulation or locomotion, transferring, toileting, and eating" qualified as an institutional setting for purposes of *Olmstead*. *Pashby v. Delia*, 709 F.3d 307, 314 (4th Cir. 2013). However, the Fourth Circuit has also stated that South Carolina Medicaid recipients may be able to "avoid institutionalization by receiving services in their homes *or community-based setting*s." *Stogsdill v. Azar*, 765 F. App'x 873, 876 (4th Cir. 2019) (emphasis added). *See also Kobe v. Haley*, 666 F. App'x 281, 284 (4th Cir. 2016)("This case concerns home and community-based services that

Plaintiff argues that SCDHHS "may not delegate, to other than its own officials, the authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters." *Kobe v. Haley*, 666 F. App'x 281, 299 (4th Cir. 2016). Additionally, a state DHHS agency "may not disclaim its responsibilities under federal law by simply contracting away its duties." *K.C. ex rel. Afr. H. v. Shipman*, 716 F.3d 107, 118 (4th Cir. 2013).[27] However, as discussed below, even when assuming such a duty existed that could not be contractually transferred, Plaintiff has still failed to present evidence creating a genuine issue of material fact to save these claims.

As stated above, any claim asserted by Grate that she was the individual that should have been informed of any feasible alternatives fails for several reasons. First, there is no evidence that she should have been advanced in priority in making decisions over Valentine's father, William. Second, and more importantly, each defendant in this action, specifically those employed at PCDSNB, had a reasonable, good-faith belief that Cunningham was Valentine's proper legal guardian. This is not a case wherein Valentine's caretakers knew of and yet simply ignored their duties to inform and seek proper consent for Valentine's care. Rather they sought consent from and to inform Cunningham—the individual that all parties, including Grate, believed to be the proper decision maker for Valentine for nearly 20 years. Additionally, this is not a case wherein Valentine's level of

---

South Carolina provides through a Medicaid waiver program for eligible persons with disabilities so that they may live in the community and avoid institutionalization.").

[27] This Court would note that the instant case varies greatly from those claims asserted in *Kobe* and *K.C.* because this case does not involve an intentional reduction of Medicaid services.

care was ever reduced, or services denied. Thus, any claims under the ADA or Rehab Act averring any failure to inform of reasonable alternatives or gain consent for treatment must fail.

Plaintiff avers that Valentine "made repeated requests" to leave Jewell Home and refers to various PCDSNB records as evidence that Valentine requested to leave PCDSNB custody. Apart from the 2003 behavior support plan addressed above, Plaintiff fails to cite to any other specific request. She instead refers generally to a sea of exhibits containing hundreds of pages. A review of these lengthy exhibits revealed documents stating that Valentine "misses her family" (ECF No. 224-15, p. 6); "wanted to call her sister" (ECF No. 224-16, p. 9); and "she wants to go to her sisters and eat turkey" (ECF No. 224-10, p. 7). Although these reports indicate Valentine expressed a general desire to visit Grate, they do not indicate any formal request was ever made to remove Valentine from PCDSNB care. Moreover, they fail to show any such request was denied or that any individual was ready, willing, and able to accept Valentine into their home.[28] A review of the records further indicates that Valentine repeatedly expressed that she was satisfied with her accommodations at Jewell Home and approved of the residential and medical care she received. (ECF No. 205-8).

---

[28] These records also indicate that Valentine talked "often about her sister [Grate] and would like to go as often as possible, but her sister works a lot and also has a family and family functions which she has to attend." (ECF No. 224-10, p. 10).

Furthermore, the day after Grate made a formal request, Valentine was released to live with Grate.[29] Although Grate avers she would have taken Valentine into her home earlier had she known she could have been compensated for in-home care, Grate was not entitled to be informed of any such alternatives. Additionally, Grate has presented no evidence that she qualified to receive such compensation, that she would have been approved to provide such services, or that the funds she may have received would have provided enough income to allow her to quit her current employment, stay home full time to care for Valentine, and also care for her own children. Thus, Plaintiff has failed to present evidence which creates a genuine issue of material fact as to these claims.

SCDHHS also echoes the PCDSNB's related argument above that "[c]ompensatory damages are not available under Title II of the ADA absent a showing of discriminatory intent." *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1146–47 (11th Cir. 2014). SCDHHS is even further removed from Valentine than PCDSNB and Plaintiff has no knowledge of any action or inaction taken by any SCDHHS employee. For these reasons and those discussed above, this Court agrees that Plaintiff has failed to show any discriminatory intent and therefore these claims must fail. As an aside, Plaintiff did not appear to offer any opposition to this argument within her responsive brief.

However, in her Reply in support of summary judgment, Plaintiff avers that she has shown deliberate indifference sufficient to satisfy the discriminatory intent requirement by averring that "DHHS was consciously indifferent to the audits and investigations

---

[29] Again, Grate first sought and received approval from William and Cunningham and William also completed the paperwork allowing Valentine's release to Grate.

documenting increasing rates of abuse, neglect and exploitation in DDSN group homes, and they failed to act to protect the health and safety of those participants, failed to spend funds to provide services in the least restrictive setting chosen by the participant and failed to protect participants' due process rights by failing to inform legal representatives of injuries and medical treatment." (ECF No. 241, p. 17).

Again, Plaintiff has failed to show a causal connection as to any funding issues and injuries alleged here. Additionally, as stated above, Grate was never entitled to be informed of Valentine's injuries, medical treatments, or feasible care alternatives. No defendant in this action can reasonably be said to have been deliberately indifferent when believing Cunningham to be the proper legal guardian, a determination to which Grate acquiesced for 20 years. Moreover, Plaintiff's general allegations of knowledge of increased rates of abuse and neglect in DDSN facilities statewide is not sufficient to show that SCDHHS "knew that harm to a federally protected right was substantially likely and failed to act on that likelihood.'" *Bone v. Univ. of N. Carolina Health Care Sys.,* No. 1:18CV994, 2021 WL 395547, at *2 (M.D.N.C. Feb. 4, 2021).

To show that there was no notice of alleged abuse or neglect at PCDSNB sufficient to support a finding of deliberate indifference, several defendants, including SCDHHS, have shown that very few incidents of abuse or neglect were reported at PCDSNB and each were appropriately handled. This is discussed in detail below in regard to the supervisory liability claims wherein Plaintiff avers there was documented widespread abuse. Additionally, Plaintiff has also referenced other "occurrences" memorialized in "accident or injury report[s]" involving Valentine and other consumers/residents at Jewell Home as

51

documentation of ongoing abuse and neglect. (ECF No. 224-10–17); (ECF No. 246-13). However, there is no indication these reports were required to be distributed to other agencies such as SCDHHS, nor do the reports show abuse from any defendant. Several of these reports document incidents such as a bite or hair pulling from another consumer. Several also document injuries of an unknown origin or resulting from pure accidents such as falling. Several of these reports include minor incidents, such as a shove, with no resulting injuries. However, each report also contains a section wherein measures were put in place to prevent similar actions in the future. (ECF No. 224-10). These reports also document recurring checks after an incident to confirm lack of injury or document progress. This Court acknowledges that these reports document several incidents involving injuries to Valentine from other consumers during her decade long stay at Jewell Home. However, these reports also indicate that injuries from other consumers were properly acknowledged, documented, and preventative measures were implemented. Thus, these reports do not constitute evidence of deliberate indifference necessary to support an ADA or Rehab Act claim.

<u>§ 1983 Claims</u>

Baker and Soura argue that Plaintiff's § 1983 claim must be dismissed for the simple fact that "there is no evidence either of them deprived Valentine or Plaintiff of a right secured by the Constitution or a federal statute." (ECF No. 205-1, p. 20). This Court agrees.

As stated in their affidavits, neither Baker, nor Soura, had any personal knowledge of issues relating to funding, staffing, or safety at Jewell Home; any issues with Valentine's Medicaid services; or any allegations of abuse or neglect as to Valentine. Additionally,

Baker notes that he did not become SCDHHS director until after Valentine's death. Accordingly, there is no genuine issue of material fact as to these claims.

Plaintiff counters that Baker and Soura may be held liable under a supervisory liability theory. "[S]upervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). "[S]upervisory liability can extend to the highest levels of state government, . . . by pinpointing the persons in the decision making chain whose deliberate indifference permitted the constitutional abuses to continue unchecked." *Id.*

First, these defendants assert that SCDHHS is a separate and distinct entity from SCDDSN or PCDSNB and therefore any actor that allegedly violated Valentine's constitutional rights, here Anderson, was not an employee over whom Baker or Soura exercised any authority or control. Because Plaintiff has failed to identify any employee/subordinate of SCDHHS having any contact with Valentine, much less an employee/subordinate engaging in conduct that posed a pervasive and unreasonable risk of constitutional harm to Plaintiff, this claim must fail.

Additionally, a plaintiff may establish deliberate indifference by demonstrating a supervisor's "continued inaction in the face of documented widespread abuses." *Shaw*, 13 F.3d at 799 (internal citations omitted). As defendants outline in their motion, there have only been two reports of abuse or neglect at Jewell Home in the past 10 years. The first occurred in September 2012, which resulted in a county magistrate judge refusing to issue an arrest warrant and the case was closed. The second involved Valentine's claim of abuse

by Anderson. (ECF No. 205-5).[30] Thus, Plaintiff has failed to show any evidence of "documented widespread abuse."

These defendants also aver that Plaintiff has failed to show an "affirmative causal link" because there is no evidence to show any act of any employee of SCDHHS resulted in Valentine suffering harm. This Court agrees. Thus, Plaintiff has failed to present any evidence to support any of the three elements of supervisory liability and this claim must be dismissed. Plaintiff offered no rebuttal to counter these specific arguments.

Plaintiff also avers that she has asserted a § 1983 claimed based on provisions of Medicaid requiring financial accountability. *See* 42 U.S.C. § 1396n(c)(2)(A)[31]. This claim merely reiterates Plaintiff's other arguments including that defendants have failed in their "obligations to inform surrogates of incompetent participants of feasible alternatives under the waiver, their obligation to protect the health and safety of participants and their obligation to assure financial accountability for federal funds the state received during Valentine's lifetime." (ECF No. 224, p. 15). As discussed above, these contentions must fail given that Grate was not entitled to be informed of Valentine's condition and Plaintiff has failed to show any funding issues caused any harm to Valentine. This is especially true given that a § 1983 claim must be asserted against Baker and Soura personally. There is no

---

[30] Also, the Pickens Sheriff's Department produced an investigation in July 2009 concerning an assault by a consumer on Anderson.

[31] SCDHHS has also asserted that 42 U.S.C. § 1396n(c)(2)(A) is not enforceable via a § 1983 claim when considering the test set forth in *Blessing v. Freestone,* 520 U.S. 329 (1997). However, for the reasons discussed above, this claim merely reiterates Plaintiff's other contentions and is subject to dismissal regardless of whether it is independently enforceable under §1983 or not.

evidence to show that Baker or Soura took any action, personally or officially, that had a direct effect on Valentine or Grate.

Although unnecessary given the above, Soura and Baker also argue that they are entitled to qualified immunity. For the reasons discussed herein as to Defendant Anderson, Soura and Baker are also entitled to qualified immunity. Plaintiff also offered no rebuttal to counter the argument for qualified immunity. Moreover, Soura and Baker also aver they are entitled to absolute legislative immunity to the extent any of Plaintiff's allegations relate to budgetary and spending issues relative to Baker and Soura, both in their roles as directors and especially during their times of employment with the Office of the Governor. Because Plaintiff has failed to show how any budget or funding issues have any sort of causal connection to Valentine's injuries, any determination as to absolute legislative immunity is unnecessary.

§ 1985 Claims

As discussed above, because the Fourth Circuit has not expressly expanded coverage of § 1985(3) claims to disabled persons, this Court will not seek to expand it here, and this claim therefore fails as a matter of law.

Although further disposition of any § 1985 claim is no longer necessary, this Court will nevertheless briefly address defendants' alternate arguments as additional sustaining grounds.

These defendants assert that there is no evidence Baker or Soura ever participated in a conspiracy. The Court agrees that Plaintiff has failed to set forth any evidence to support these allegations. Plaintiff has failed to allege any specific actions or facts showing

the "who, what, where, when or why" of any alleged conspiracy. Plaintiff has only set forth broad allegations of misdeeds which have gone unsubstantiated.

Additionally, a vital element of any § 1985 claim is that the defendant must be motivated by a specific class-based invidiously discriminatory animus. Plaintiff has offered no evidence to support this element other than merely reciting it within their briefs.

Furthermore, to the extent Plaintiff alleges a conspiracy arising from Governor Haley's executive budgets that were prepared with the assistance of Soura and Baker when they both worked for the Office of the Governor, there can be no conspiracy between the employees within the same agency and such a claim is barred by the intracorporate immunity doctrine. *Anthony v. Ward*, 336 F. App'x 311, 315 (4th Cir. 2009) (addressing doctrine in state law context); *Buschi v. Kirven*, 775 F.2d 1240, 1251 (4th Cir. 1985) (recognizing doctrine in § 1985 context).

<u>RICO Claims</u>

These defendants also assert that the RICO allegations against them should be dismissed for several reasons including that there is no evidence of any predicate acts, an enterprise, or that Soura or Baker were employed by or associated with the enterprise carrying out a pattern of racketeering activity. This Court agrees. Plaintiff failed to present any evidence of predicate acts. Plaintiff is not aware of any racketeering by any defendant in this case. As stated above, Plaintiff's vague allegations fail to identify the "who, what, where, when or why" needed to create a genuine issue of material fact. In support of this argument, these defendants quote Plaintiff's responses to their interrogatories. These responses (ECF No. 205-6) evidence Plaintiff's complete failure to identify any specific

actions taken by these defendants. Plaintiff's responses make clear that they have no evidence of any relevant actions taken by Baker or Soura and Plaintiff failed to conduct any discovery in this action which would substantiate these claims. Quite simply, Plaintiff made severe allegations, including obstruction of justice and witness tampering, of vague conduct purportedly undertaken by various defendants. After that, however, Plaintiff failed to substantiate these allegations and instead relied on unsupported assertions arising out of a failure to properly spend funds allocated by the General Assembly.  Despite this, Plaintiff asks the Court to let her proceed with litigation without ever attempting to argue a causal connection exists between prior funding problems and Valentine's injuries. The Court declines such an invitation.

Moreover, Plaintiff's claims appear to rest solely on allegations that funds were not appropriately applied to support Medicaid services or that cost reports were either fabricated or not provided to the federal government. As referenced above, Plaintiff has failed to show how any alleged funding issues caused any damages to Grate or Valentine even if true. There is no evidence Valentine was ever denied Medicaid benefits or suffered a reduction in service. Likewise, Grate's allegations that she may have been entitled to compensation for in-home services to Valentine is pure speculation and cannot support a RICO action.

Therefore, SCDHHS, Baker and Soura's motion for summary judgment is granted in full. For the same reasons, Plaintiff's cross-motion for summary judgment is denied as to these defendants.

### d.  SCDDSN Motion for Summary Judgment

SCDDSN is responsible for providing care and treatment to persons who have intellectual and related disabilities pursuant to South Carolina law. Here, SCDDSN moves for summary judgment as to Count One of Plaintiff's SAC asserting ADA and Rehab Act violations. This is the only cause of action asserted against SCDDSN.

SCDDSN's arguments in support of its motion are nearly identical to those arguments asserted by SCDHHS above. Specifically, SCDDSN argues that Plaintiff has no evidence to support a claim that anyone at DDSN knew of a request by Valentine to move from Jewell Home. SCDDSN essentially avers that any request to leave would have been made to Anderson or another PCDSNB employee. Because SCDDSN did not employ any of these individuals, it cannot be held responsible for any unanswered requests to leave. This Court agrees. Moreover, there is no evidence that any request to leave was ever received or denied. Plaintiff has also failed to present any evidence of the requisite discriminatory intent or deliberate indifference. For these reasons, and all reasons discussed above in relation to SCDHHS, Plaintiff has failed to create a genuine issue of material fact and SCDDSN is entitled to summary judgment as to Count one.

Thus, SCDDSN's motion for summary judgment is granted in full. For the same reasons, Plaintiff's cross-motion for summary judgment is denied as to this defendant.

e. **Motion for Summary Judgment by Robert Kerr, Stanley Butkus, Patrick Maley, Lois Park Mole, Susan Beck, Beverly Buscemi, Kathi Lacy, William Barfield, Thomas Waring, and William Danielson**

These ten individual defendants are alleged to have some present or former association with the SCDDSN. They now move for summary judgment as to Plaintiff's claims.

§ 1983 Claims

The § 1983 claim asserts in effect that eight of these individual Defendants[32]—all associated in some way with DDSN at the statewide level—knew or should have known that Valentine was likely to suffer injury at the Jewell Home.

These defendants assert the same arguments alleged by Baker and Soura above to combat the claims of supervisory liability. Specifically, only two incidents of abuse were reported as to Jewell Home from 2010 to 2017. SCDDSN goes into further detail by discussing "critical incident" reports which document certain incidents occurring within a service provider facility. [33] Between January 1, 2010 and mid-April 2017, there were four critical incident reports filed with DDSN that involved residents of the Jewell Home. All four events were reported as critical incidents, per standard procedure, because they involved the hospitalization of Jewell Home consumers/residents. Three of those four

---

[32] The § 1983 claim has not been asserted against Defendants Kerr and Barfield.

[33] Plaintiff has also referenced other reports of incidents (often referred to as "behaviors") involving Valentine and other consumers at Jewell Home as documentation of ongoing abuse and neglect. (ECF No. 224-10). However, there is no indication these reports were required to be distributed to other agencies, nor do they show abuse from PCDSNB employees. Although some document incidents such as a bite from another consumer, most of these reports include minor incidents with no resulting injuries. Accordingly, they do not serve as any evidence of documented widespread abuse or neglect by any defendant.

instances involved hospitalizations, but not as a result of abuse, neglect or injury. In those three instances, DDSN found that there were no violations of any rule, regulation or policy.[34] The other incident involved a medication error by an employee of the PCDSNB which resulted in that employee's prompt termination. As discussed above, the incident reports indicate that Plaintiff has failed to show any evidence of "documented widespread abuse" or that anyone at the Jewell Home was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like Valentine. Thus, any claims for supervisory liability must fail.

Apart from Plaintiff's failure to allege injuries discussed above, these individual defendants also aver that Plaintiff has failed establish the second prong of supervisory liability by failing to set forth specific allegations as to any of these individuals. Defendants argue that most of the moving defendants either were not employed by DDSN at any relevant time, or if so employed, were not in positions with responsibility over the complained-of matters. Defendants set forth the following assertions to support this argument:

> 1. Robert Kerr: Mr. Kerr was never a DDSN employee, and as such, had no responsibility for reviewing activities at contracted facilities such as the Jewell home. Nor did he possess any authority to act for the State of South Carolina after he left DHHS in 2007.

> 2. William Barfield: Mr. Barfield retired from DDSN in 2009, years before the alleged injuries occurred; his later work with Kerr & Co., like that of Mr. Kerr, did not involve reviewing activities at contracted facilities such as the

---

[34] One of these incidents involved Valentine being admitted to the hospital on March 16, 2012 as a result of low sodium levels. DDSN concluded that there "were no violations of rules, regulations, policy or procedure." (ECF No. 204-2, p. 4).

Jewell home. Nor did he possess any authority to act for the State of South Carolina after he left DDSN in 2009.

3. Stanley Butkus: Dr. Butkus retired from DDSN in 2009 and was never thereafter in a position with responsibility for reviewing activities at contracted facilities such as the Jewell home.

4. Kathi Lacy: Dr. Lacy retired from DDSN in 2013 and was never thereafter in a position with responsibility for reviewing activities at contracted facilities such as the Jewell home.

5. Lois Park Mole: Ms. Mole was DDSN's Director of Government & Community Relations from 1990 until 2018. Her responsibilities did not include the review of activities at contracted facilities such as the Jewell home. Mole Affidavit, Ex. 10, ¶ 3.

6. William Danielson: Mr. Danielson was a DDSN Commissioner from June 2014 through the end of 2017, and Commission Chair from March 2015 through June 15. By statute, S.C. Code Ann. § 44-20-220, the responsibilities of the DDSN Commission (a citizens' commission) are in areas of policymaking and in appointing the DDSN Director. The Director, in turn, is the official responsible for the administration of DDSN. S.C. Code Ann. § 44-20-230.

[7.] Still another Defendant, Patrick Maley, began his employment with DDSN in the latter part of February 2017, a little more than a month before the March 31, 2017 slapping incident referenced in the SAC.

[8.] An eighth Defendant, Thomas Waring, was the DDSN Associate State Director for Administration at pertinent times, having retired in 2018. However, Mr. Waring is mentioned just once in the Second Amended Complaint.

(ECF No. 204-1, p. 13-14).

This Court agrees that Plaintiff has utterly failed to connect any of the above defendants to any injuries actually suffered by Valentine or alleged by Grate.[35] Plaintiff

---

[35] These defendants also noted in their Reply that "Defendants Kathi Lacy and Susan Beck, who have been Defendants in this case for almost three years, are not even mentioned by name [in Plaintiff's Response]". (ECF No. 235, p. 6).

has offered no evidence that any of the above defendants themselves personally responded to that (nonexistent) knowledge in a way that was so inadequate as to show "deliberate indifference to or tacit authorization" of the alleged offensive practices. Hence, those defendants are entitled to summary judgment.

Thus, "the only Defendants who were even theoretically in a position to have taken actions reviewable under *Shaw v. Stroud* are Susan Beck and Beverly Buscemi." (ECF No. 204-1, p. 14). However, even these defendants are entitled to summary judgment in this action given the above determination that Plaintiff has failed to present evidence of "documented widespread abuse" or that anyone at the Jewell Home was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like Valentine.

Additionally, as addressed several times above, any of Plaintiff's claims premised on funding must be dismissed as Plaintiff has not provided any specific evidence of causation between any aspect of funding and harm to Valentine or Grate.

Plaintiff also asserts in the § 1983 claim that "Defendants," who are unspecified, "violated 42 U.S.C. § 1396n(c)(2)(C), which required Defendants to ensure that Grate was informed of the feasible alternatives available under the waiver and to inform Grate of the alternative of family members being paid to provide care in the home." For reasons explained above, Grate was not entitled to any such information and this claim must fail.

Although unnecessary given the above, these defendants also argue that they are entitled to qualified immunity. For the reasons discussed herein as to Anderson, Soura and Baker, these defendants are likewise entitled to qualified immunity.

§ 1985 and RICO Claims

Additionally, these defendants are entitled to summary judgment as to Plaintiff's § 1985 and RICO claims for the same reasons discussed above. Namely, that this Court declines to expand § 1985(3) claims to disabled persons and that Plaintiff has failed to present evidence of any predicate acts, an enterprise, or that any of the above defendants were employed by or associated with the enterprise carrying out a pattern of racketeering activity.

Thus, the motion for summary judgment by these 10 defendants is granted in full. For the same reasons, Plaintiff's cross-motion for summary judgment is denied as to these defendants.

### f. Motion for Summary Judgment by McMaster, Haley, and the Office of The Governor

Haley served as South Carolina's Governor from 2011–2017 and McMaster is the current Governor having served in that role since January 2017. The Office of the Governor is only named in Count 1 of the SAC which alleges violations of the ADA and Rehab Act. Haley is named in the § 1983 claim, the § 1985 civil conspiracy claim, and the RICO claim. McMaster is named in the § 1983 claim and the RICO claim, but not in the § 1985 civil conspiracy claim. They now move for summary judgment as to all claims against them.

ADA and Rehab Act Claims

Defendants argue that in the absence of specific involvement by the Office of the Governor in connection with the ADA or the Rehab Act, Plaintiff cannot show the existence of a legal duty on the part of the agency. Defendants essentially argue that the

Office of the Governor is not responsible for the administration of services to Valentine. Fourth Circuit precedent supports this assertion. In *Kobe v. Haley*, 666 F. App'x 281, 299–300 (4th Cir. 2016), the Fourth Circuit stated that:

> In arguing that Governor Haley bears the necessary relationship to the ongoing violations they allege, they note that Appellees "have refused to restore service levels of waiver participants to the pre-2010 level, ... refused to pay for Kobe's speech services, refused to acknowledge Kobe's right under the Medicaid Act and ADA to a speech device and have refused to provide funding for Kobe to live outside of a congregate setting." Appellants' brief at 35. What Appellants fail to appreciate, however, is that Governor Haley is not an official with responsibility for these decisions, nor does she have the authority to change them. South Carolina has designated DHHS to administer and supervise Medicaid. *See* S.C. Code § 44-6-30; *see also* 42 C.F.R. § 431.10 (providing that each state's Medicaid plan must designate a single state agency to administer the Medicaid plan). And DHHS "may not delegate, to other than its own officials, the authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters." 42 C.F.R. § 431.10(e). Although Governor Haley appoints DHHS's Director, *see* S.C. Code § 44-6-10, she has no direct authority to administer South Carolina's Medicaid plans; rather, she is limited to reviewing and commenting on proposed plans, *see* 42 C.F.R. § 430.12(b).

(emphasis added).

As stated above, Plaintiff alleges that Valentine was not offered or provided the option or funding to live outside of Jewell Home. However, the Office of the Governor is not the entity charged with informing Medicaid recipients of feasible alternatives or approving funding for services and cannot therefore be held responsible. Thus, the motion should be granted on this count.

Even if the Office of the Governor had such a duty, there is no evidence in the record that Plaintiff was harmed by any action or inaction from the Office of the Governor. Plaintiff's claims appear to center on the failure to offer for Valentine to live in less

restrictive setting (i.e. in a family member's home) and failure to provide funding to Grate who alleges she would have provided care for Valentine. However, as discussed in detail above, Grate was not entitled to any such information and any claim for possible payment for in-home services is speculative at best. Additionally, Plaintiff has again failed to allege any specific facts showing discriminatory intent or deliberate indifference. Thus, this claim must fail.

### § 1983 Claims

Defendants argue that the § 1983 claim should be dismissed because of the absence of proof of personal knowledge of relevant facts by defendants Haley and McMaster.

Plaintiff does not claim the Governors had any specific knowledge of Valentine, Grate, PCDSNB, or Jewell Home and it appears her theory of liability rests solely on supervisory liability pursuant to *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Plaintiff alleges that general knowledge of abuse and neglect in home settings across the state is enough to prove liability of the Governors. However, this ignores the holding in *Kobe* that states that DHHS, not the Governor, is responsible for administering and supervising Medicaid. Thus, Plaintiff cannot show that general knowledge of abuse and neglect has an "affirmative causal link" to Jewell Home abuse or damages sustained by Valentine and Grate.

### §1985 and RICO

Defendants argue that with regard to the § 1985 and RICO claims—both of which assert claims relating to lack of funding—Plaintiff has not produced evidence showing that

either Valentine or Grate were affected by any alleged lack of funding. As stated several times above, the Court agrees.

Initially, the Court would again note that it declines to extend § 1985 conspiracy claims to disabled persons and this claim fails as a matter of law. Nevertheless, these Defendants' alternate arguments will be addressed below as they are interrelated to those arguments against the RICO claim.

Plaintiff's allegations center on the alleged diversion of funding approved by the South Carolina General Assembly for impermissible purposes. This diversion allegedly resulted in a loss of Medicaid matching funds from the federal government.

As this Court has stressed throughout this litigation, Plaintiff has offered absolutely no evidence to suggest that, even if there was a conspiracy to divert funds, any of those alleged actions had any sort of causal link to any injuries alleged here. Again, Plaintiff has not shown that Jewell Home was understaffed or underfunded. She has not shown that funding did not exist for Valentine or that Grate was ever entitled to funding. Instead, records show that Valentine's needs were paid for by Medicaid and Grate was not informed of in-home care alternatives because she was never a legal guardian entitled to such information. Thus, Plaintiff has failed to present evidence of a genuine issue of material fact which would prevent summary judgment.

Additionally, as with other Defendants, there is also no evidence Haley or McMaster conspired with others or were "motivated by a specific class-based, invidiously discriminatory animus" as required by § 1985.

For the reasons discussed above in relation to other individual Defendants, the Governors are also entitled to qualified immunity although such a determination is technically unnecessary. The Court declines to rule on the Governor's tertiary arguments regarding legislative immunity.

For all of the reasons given above, the Governors' motion is granted in full and Plaintiff's cross-motion for summary judgment must be denied.

Again, this Court notes that sifting through the various arguments and counterarguments has been made unduly cumbersome given Plaintiff's numerous attempts to incorporate other arguments, irrelevant assertions, and failures to cite to any specific page or portion of the voluminous records filed in this case. However, the Court has endeavored to address each of the arguments presented throughout the various motions. To the extent that any contention raised by Plaintiff has not been addressed above, the Court determines that Plaintiff has failed to present a genuine issue of material fact in response to defendants' various arguments.

The ultimate result of these combined motions is to: (1) deny Plaintiff's motion for partial summary judgment in full; (2) grant in part and deny in part Anderson's motion for summary judgment; and (3) grant all other Defendants' motions for summary judgment in full. Thus, Anderson is the only remaining defendant and only those §1983 claims alleging direct assault or abuse against Valentine will proceed.

## VI.     CONCLUSION

For all of the reasons stated above:

(1) Anderson's motion for summary judgment (ECF No. 198) is granted in part and denied in part;

(2) The Office of the Governor's motion for summary judgment (ECF No. 201) is granted in full;

(3) Haley and McMaster's motion for summary judgment (ECF No. 202) is granted in full;

(4) SCDDSN's motion for summary judgment (ECF No. 203) is granted in full;

(5) Barfield, Beck, Buscemi, Butkus, Danielson, Kerr, Lacy, Maley, Mole, and Waring's motion for summary judgment (ECF No. 204) is granted in full;

(6) Baker, Soura, and SCDHHS's motion for summary judgment (ECF No. 205) is granted in full;

(7) Thena, Owens, and PCDSNB's motion for summary judgment (ECF No. 206) is granted in full; and

(8) Plaintiff's motion for partial summary judgment (ECF No. 225) is denied in full.

The Court will enter a separate pretrial scheduling order for the remaining claims against Defendant Anderson.

IT IS SO ORDERED.

*Joseph F. Anderson Jr*

August 5, 2021                                          Joseph F. Anderson, Jr.
Columbia, South Carolina                          United States District Judge